IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IGNACIO DAMIAN FIGUEROA,
on behalf of himself and
others similarly situated,

      Case No.

     Plaintiff,

      CLASS ACTION COMPLAINT

v.      JURY TRIAL DEMANDED

MERSCORP, INC., a foreign corporation;
LAW OFFICES OF DAVID J. STERN, P.A.,
a Florida  professional association; and DAVID J.
STERN, individually,

     Defendants.
_____/

## COMPLAINT

Comes now the Plaintiff, Ignacio Damian Figueroa, on his own behalf and on behalf of others similarly situated, and sues the Defendants, Merscorp, Inc., the Law Offices of David J. Stern, P.A., and David J. Stern, individually, as follows:

### The Nature of the Action

1.     This is an action for triple damages, costs and attorney fees under 18 U.S.C. §§1962 and 1964, otherwise known as the "Racketeer Influenced and Corrupt Organizations Act" or "RICO."      **The Named Parties**

2.     Ignacio Damian Figueroa is the Plaintiff.  He brings suit as Class Representative.  He has standing to sue in that capacity because he possesses the same interest and suffered the same type of  injury as all other Class Members.

3.     Defendant Merscorp, Inc., is a foreign corporation created in or about 1998 by conspirators from the largest banks in the United States in order to undermine and eventually eviscerate long-standing principles of real property law, such as the requirement that any person or

entity who seeks to foreclose upon a parcel of real property: 1) be in possession of the original note and mortgage and 2) possess a written assignment giving he, she or it actual rights to the payments due from the borrower pursuant to the mortgage and note.  Defendant Merscorp, Inc., claims to be the sole shareholder in an entity by the name of Mortgage Electronic Registrations Systems, Inc., ("MERS").  MERS is the RICO enterprise and is the primary innovation through which the conspirators, including the Defendants, have accomplished their illegal objectives as detailed throughout this Complaint.

4.      The Defendant Law Offices of David J. Stern, P.A., (hereinafter "the Defendant Firm"),  is a professional association with its principal place of business in Plantation,  Florida. The Defendant Firm's attorneys primarily represent plaintiffs in foreclosure actions.  Based upon statements by its owner and co-Defendant, David J. Stern, the Defendant Firm in 2008 and 2009 filed between 4000 and 7000 new foreclosure actions in the State of Florida per month.  Beginning in or about 1999, the Defendant Firm joined with Defendant Merscorp, Inc., and other conspirators in the fraudulent scheme and RICO enterprise herein complained of.  The employees of the Defendant Firm, including many licensed attorneys,  have become skilled in using the artifice of MERS to sabotage the judicial process to the detriment of borrowers, and, over the past several years, have routinely relied upon MERS to do just that.

5.      David J. Stern is an attorney licensed in Florida since 1991.  He is the sole owner of the Defendant Firm. He is responsible for its actions because he caused them, and also because attorneys and other professionals may not use a corporate facade to protect them from liability arising from the practice of their professions.  David J. Stern is also the founder of DJSP Enterprises, Inc., ("DJSP").  This entity functions as a title company, and it makes its revenue doing "title work" to assist in the disposition  of foreclosed properties.  According to its company profile,

2

it provides legal and non-legal services regarding "lender owned real estate."[1]  Properties of this type, which are owned by the lenders or other real parties in interest, are referred to as "REO's."  David J. Stern uses DJSP to perform "processing" and title services relating to those post-foreclosure REO properties, thereby increasing his massive profits from the illegal enterprise herein described.  The entity "went public" at some time in the recent past, resulting in substantial profits to David J. Stern.  While it purports to function through one or more "subsidiaries," its telephone number is the same as the one listed for the Defendant Firm.  David J. Stern, through these and other "spin-off" entities, has made hundreds of millions of dollars fraudulently subverting the judicial process and the constitutional safeguards designed to protect the rights of litigants so as to manufacture a foreclosure and foreclosure-litigation industry which simply drives the hapless citizens in his path to cycle after cycle of impossible loan and inevitable foreclosure.  As Stern boasted to a room of investors at a recent promotional event, recent "direct source initiatives" by the larger lenders increasingly enable the Defendant Firm, DJSP, and other entities recently formed by Stern to take mortgages "from cradle to the grave."

**Narrative Background: "A Subtle Stranger" Orchestrates a Paradigm Shift[2]**

6.      In and about the years 1998 and 1999, the mortgage industry introduced new "products" into the American marketplace.  These products included "non-documentation loans" and adjustable rate mortgages, known as "ARMS." Mortgage lenders, acting in coordination with one another, relaxed their standards for lending, which made an entirely new class of lower-income

---

[1] Http://finance.yahoo.com/q/pr?s=DJSP+Profile

[2] This is an extraordinary case.  At times, as explained in this Complaint, words do not even have their traditional meanings in the new MERS order. For this reason, it is believed that an unconventional pleading style can and will best convey the Plaintiff's message, and tolerance for such unconventionality is respectfully requested as being in the best interests of justice and truth.  In light of the liberties taken by the *Defendants* in terms of judicial administration and procedure, the tolerance of this Court for the slightly unconventional stylings of the undersigned counsel in this pleading would seem to be warranted.

individuals eligible to receive loans.  This, in turn, drove up property "values."  As part and parcel of this scheme, banks and other lenders "accepted" appraisals "documenting" the new, higher values, and approved hundreds of thousands of applications for financing, most of which would normally have been declined.

7.     Unbeknownst to the borrowers and the public, the billions of dollars spent to fund these loans were expended to "prime the pump."  The big institutions and the conspirators were making an investment, but the expected return was NOT the interest they pretended to anticipate receiving as borrowers paid the  mortgages.  The lenders knew that the new loans were "bad paper;" this was of little concern to them because they intended to realize profits so great as to render such interest, even if it had been received, negligible by comparison.  Part of the reason this fraudulent scheme has gone largely unnoticed for such an extended period of time is that its sophistication is beyond the imagination of average persons.  Similarly beyond the imagination of most persons is and was the scope of the **DISHONESTY** of the lenders and those acting in furtherance of the scheme, including the present Defendants.  Through the present time, persons acting within the ambit of this conspiracy, most particularly including the Defendants herein, have continued to operate consistent with the core principles of dishonesty and obscurantism engendered by the original conspirators.  These dark influences have spread throughout the financial services, lending and banking industries into the national economy and beyond, threatening the economic stability of the United States and the world as a whole.  This Court is urged in the strongest possible  way to apply a presumption of **FALSITY** when reviewing any documentary evidence filed in this Court by one or more of the Defendants. Such a presumption is not just warranted; it is t indeed <u>compelled</u> by the extent to which the Defendants and those with which they are associated have long acted in a malicious and wanton manner evincing complete contempt for the judicial process and the rights of persons having interests

4

contrary to their own.  This is particularly true because the Defendants' contempt for due process is compounded by their specific intention to obviate the requirement that documents prepared for legal use be truthful, authentic, and legitimate.

8.      There is one sort of lie that, when later discovered, constitutes the strongest possible proof of a person's malicious intentions.  What is it?  A lie about one's name or identity.  Many such lies are present in this instance.  The whole purpose of MERS is to allow "servicers" to pretend as if they are someone else: the "owners" of the mortgage, or the real parties in interest.  In fact they are not.  The standard MERS/Stern complaint contains a lie about this very subject.  While the title of the standard complaint makes reference to "lost loan documents," in the body of the standard complaint, the Defendant Firm alleges that the plaintiff is the "owner and holder" of the note and mortgage.  Both cannot be true unless the words used are given new meanings.  (Sample attached as Exhibit A).  Sometime after March 13, 2008, but before February 12, 2009, the Defendant Firm changed the standard Complaint so that it now reads: "Plaintiff, as servicer for the owner and acting on behalf of the owner with authority to do so, is the present designated holder of the note and mortgage with authority to pursue the present action."  Yet in this latest version, the Stern Firm describes an assignment of the mortgage which has already occurred, with the "assignee" being the plaintiff in the case - - the same plaintiff who is simultaneously described as a "designated holder" who is "acting on behalf of the owner."  (Exhibit B). This is a contradiction: either the plaintiff is <u>designated to</u> act on behalf of the real party in interest, or it is *itself* the real party in interest pursuant to the alleged "assignment."

9.      In the years leading up to the introduction of the new loan "products," the conspirators laid the groundwork which would grow into a new mortgage lending infrastructure: a new paradigm in which the ratios of risk to reward were dramatically altered in favor of these

monied interests and to the detriment of common consumers.  One material bulwark in the support

for this new paradigm was the inclusion in new mortgages of intentionally ambiguous and infinitely

malleable provisions pertaining to MERS.  As is the case with most of the written documents

routinely used in the scheme, such as "assignments" and complaints for foreclosure, each word

concerning MERS in these standardized mortgages is carefully crafted so as to allow those relying

upon it to infinitely recede in their positions and to be moving targets virtually unreachable by

standard legal means.  The standard mortgage is a form entitled "FLORIDA-Single Family- Fannie

Mae/Freddie Mac UNIFORM INSTRUMENT-MERS," or some slight variation thereof. Upon

reading the standard mortgage clauses pertaining to MERS, even persons of high intelligence will

have a sense that they should, but do not quite, comprehend them.  Consider these:

> "**MERS**" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation
> that is acting solely as a[3] nominee for Lender and[4] Lender's successors and assigns. MERS
> is the mortgagee under this security instrument.[5] MERS is organized and existing under the
> laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI
> 48501-2026, tel. (888)679-MERS.

[ . . . . ]

> TRANSFER OF RIGHTS IN THE PROPERTY
> This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals,
> extensions and modifications of the Note; and (ii) the performance of Borrower's covenants

---

[3] This allows for another "nominee;" one which could apparently coexist with MERS.

[4] "Is" is present tense - - this seems to indicate that as of the time of execution of the
mortgage, MERS was performing some unknown service for both lender and its "successors and
assigns" even though ostensibly the mortgage had not as of execution been assigned.  Upon
assignment, it would seem to be impossible for MERS to act as "nominee" for the original
lender. This phrase also tacitly acknowledges that the mortgage will be assigned.

[5] No, it is not.  Here is the definition of the term from the first available free Internet site,
www.law.dictionary.com :  "mortgagee: n. the person or business making a loan that is secured
by the real property of the person (mortgagor) who owes him/her/it money."

and agreements under this Security Instrument and the Note.  For this purpose,[6] Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS,[7] the following described property located in the COUNTY of BROWARD.[8]

[ . . . . ]

Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument,[9] but, if necessary to comply with law or custom,[10] MERS (as nominee for Lender and Lender's successors and assigns) has the right to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property, and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

(Typical MERS mortgage and note are attached hereto as Composite Exhibit C).

10.     Beginning soon after the "ink" on the new mortgages was  "dry," the lenders promptly sold the loans, in secretive transactions, to "investors" for some percentage or fraction of what had been the alleged value of the mortgage and the property by which it was secured just days or weeks earlier.  The quick sale by the lender of its interest, at what appears to be a loss, would have at first seemed inexplicable, but when considered with the benefit of hindsight, proof of these quick transfers would have been evidence that the lender knew in advance that property values would soon decline.  By constantly changing "servicers" on these loans, and by sending out notices of such

---

[6] There is no "purpose" stated in the preceding sentence.

[7] How can the borrower simultaneously "convey" the property to: (1) MERS as nominee for lender; (2) MERS as nominee for lender's successors and assigns; and (3) MERS's *own* successors and assigns?  Furthermore, who *are* such successors and assigns?  No assignment could have existed as of the moment the mortgage was executed by the borrowers, and if somehow same did exist, it should have been disclosed as a fundamental and material aspect of the transaction.  If the assignment occurred prior to the mortgage, the mortgage itself is void because the lender had no interest to secure.

[8] A mortgage is **not** a conveyance of property by operation of Florida law.

[9] What "interests" does this passage refer to, and to *whom* were they granted?

[10] No "law or custom" could possibly necessitate action by MERS, as opposed to action by the original lender.

changes drafted also in intentionally ambiguous verbiage, the bankers behind the scenes cooperated in obscuring the truth as to who had the right to receive the proceeds of the loans, and to foreclose in the event of non-payment.  The loans were grouped into "pools" and sold multiple times, thereby increasing profits for the wrongdoers.  These "securitized debt pools" were sold on the stock market and elsewhere, and in this manner affected interstate commerce.  The real parties in interest also in many instances collected mortgage insurance upon "default."

11.     Another part of the scheme was the use of words in ways inconsistent with their traditional meanings, and the creation of new terms which could be used to blur important distinctions between parties and their interests.  The revolutionary ways in which words were utilized all shared one characteristic: they made it more difficult to determine who had the right to receive and utilize for their own purposes the payments made on the loan by the borrower.  For example, "mortgagee" began to have a meaning other than "lender." *See* n. 4, *supra*.   "Servicer" arose to prominence and was and is used to further obscure important truths.  Specifically,  the "servicer" may or may not hold the true beneficial interest in the mortgage, and the Defendants will NOT release any further information on the subject, whether it is requested in discovery in a foreclosure action or in any other context.

12.     With the oversight of Defendant Merscorp and its unknown principals, the MERS artifice and enterprise evolved into an "ultra-fictitious" entity, which can also be understood as a "meta-corporation."  To perpetuate the scheme, MERS was and is used in a way so that to the average consumer, or even legal professional, can never determine who or what was or is ultimately receiving the benefits of any mortgage payments.  The conspirators set about to confuse everyone as to who owned what.  They created a truly effective smokescreen which has left the public and most of the judiciary operating "in the dark" through the present time.

13.     Although not an element of the Plaintiff's cause of action, the truth of the matter is that reasoned contemplation of the available facts leads to a stunning realization: the mortgage crisis and resulting economic downturn with which the United States is currently afflicted was **planned in advance by certain scions of Wall Street**. In addition to the other incriminating facts set forth in this Complaint and documented in the exhibits hereto, consider this: On its website, www.mersinc.org, Defendant Merscorp lists the shareholders of "MERS," which is defined on a separate page of the site as "Mortgage Electronic Registration Systems, Inc."  Among the shareholders of MERS, according to the site, are the following institutions: Bank of America, Chase, CitiMortgage, Inc., Fannie Mae, Freddie Mac, HSBC, SunTrust, and Wells Fargo.  These are many of the same institutions the Defendant Firm represents.  This is no coincidence, as these entities are co-conspirators in the MERS scheme herein described.

14.     The conspirators intended to maintain an absolute stranglehold on the American economy for many decades, if not centuries, into the future. This could only be accomplished if the scheme was able to evolve over time in a changing regulatory and consumer environment. The point is that the conspirators adjusted the American lending system and the legal system governing it in a way designed to most effectively gratify their greedy interests over the longest period of time. Through this revolution in the use of words and ephemeral concepts such as the "corporation," the conspirators, including the present Defendants, have by-and-large been successful in changing the paradigm so that the rights of individuals are no longer afforded the safeguards which have been carefully maintained in place since the time of the Magna Carta. As the conspirators and present Defendants have long intended,  certain important terms in the mortgages and other legal documents are devolving into a state of meaninglessness.  Even the names of the mortgage and lending institutions are tinkered with and interchanged so often that it is difficult to keep track of the

9

constantly shifting parameters of the series of alleged mergers, assertions of subsidiary relationships, "divisions," and the like with which the American economy and consumer populace are deluged in advertisements and mortgage documents.  This is not some random trend which resulted from the mortgage crisis.  It is, instead, just another tactic in the vast scheme which ultimately <u>caused</u> it.  The end result of the continued obfuscatory actions is that the mortgages and associated documents come to mean whatever their proponents wish them to mean.

15.    The conspirators of course did not want there to be any documentation which could later potentially be used as evidence of their crimes.  They did not want to pay the fees associated with recording mortgages and they did not want to be bothered with the trouble of keeping track of the originals. That is the significance of the word 'Electronic' in Mortgage Electronic Registration Systems, Inc.  The conspirators, through this exceptionally sophisticated legerdemain, made over the American judicial system's long-honored requirements for mortgages and foreclosures to serve their own selfish interests and to minimize the possibilities of the victims obtaining any meaningful redress through the courts. They undermined long-established rights and sabotaged the judicial process itself by de-emphasizing the importance of, and eventually eliminating, "troublesome" documentation requirements.  While conversion to electronic loan documentation will eventually be implemented, it is the **People**, by and through their elected representatives, who will ultimately bring about this transition through duly enacted legislation.

### The Defendants' Creation and Use of Fraudulent Assignments

16.    In the cases in which the Class Members asserted a "standing" defense, whether *in propria persona* or through counsel, the Defendant Firm and Defendant Merscorp, Inc. relied upon MERS to obscure the truth and illegally obtain final judgments of foreclosure.   If pressed on the standing issue, the Defendant Firm would generate fraudulent "assignments" which, like all the other

documents used to perpetuate the scheme from its inception, were intentionally ambiguous.  (A collection of fraudulent and facially defective "assignments" created and filed by the Defendant Firm is attached hereto as Composite Exhibit D).   In these remarkable and totally fraudulent "assignments," the following irregularities usually appeared:

> a) The assignor, MERS, had the same address as the assignee (the plaintiff);
>
> b) They were  executed by a person having the title of "Assistant Secretary;" and
>
> c) the document would have an "effective date" well prior to the date upon which it was executed, so as to retroactively give standing to the plaintiff.

17.       Incredibly, since 2009 it has come to light that the persons signing these assignments as "assistant secretary," and occasionally as "vice president" of MERS actually were NOT officers or employees of MERS.  Instead, these persons, such as a woman by the name of Cheryl Samons, actually are and were employees of the Defendant Firm.

18.       In May of 2009, an attorney who questioned the validity of such an assignment took the deposition of Ms. Samons at the Defendant Firm's office in Plantation, Florida.  He inquired of Ms. Samons how she could possibly have acted on behalf of MERS, and the meaning of the label "Assistant Secretary:"

> Q: The question was you have no job duties as an assistant secretary of MERS, correct?
> A: I do not have any job duties other than signing the assignments and mortgage.  Does that help?
> Q: Yes.  Here, I'll try to rephrase this.  Do you attend any board meetings at MERS?
> A: No, sir.
> Q: Do you attend any meetings at all at MERS?
> A: No, sir.
> Q: Do you report to the secretary of MERS?
> A: No, sir.
> Q: Who is the secretary of MERS?
> A: I have no idea.
> [ . . . ]
> Q: Where are the MERS offices located?
> A: I can't remember.

Q: How many offices do they have?
A: I have no idea.
Q: Do you know where their headquarters are?
A: Nope.
Q: Have you ever been there?
A: No.
Q: How many employees do they have?
A: I have no idea.[11]

19.     The plaintiffs represented by the Defendant Firm simply had no standing

whatsoever. Even in the cases in which, due to a challenge by the defendant(s), one of these bogus,

fraudulent assignments was fabricated and filed, the plaintiffs were not the real parties in interest.

The attorneys of the Defendant Firm filed these assignments with the courts while being fully aware

that they were misleading fabrications designed specifically to disenfranchise the borrower-

defendants.  The assignments, in addition to being fraudulent, were not <u>competent</u> to convey any

interest in the property or to bestow standing upon the strawman assignee/plaintiffs. As detailed

below, Defendant Merscorp, Inc. allowed the Defendant Firm to use its "name" in creating and

utilizing these assignments.

20.     The same employee of the Defendant Firm quoted above was, on April 29, 2010,

deposed by the undersigned counsel in a separate foreclosure action.  At that time Cheryl Samons

made a concession of truly momentous significance.  She testified that her signatures on "these

assignments," which from all indications were and are at least several thousand in number, were in

no way attestations that the statements contained therein were accurate or truthful.  She further

testified that she was the person with the most knowledge about the subject assignment:

---

[11] May 20, 2009 deposition of Cheryl Samons, taken in the case styled *Deutsche Bank National Trust Company, as Trustee for Morgan Stanley ABS Capital 1 Inc. Trust 2006-HE4 v. Belourdes Pierre, et al.,* Florida's Fifteenth Judicial Circuit case no. 50-2008-CA-028558 XXXX MB, pages 25-26.

Q: It says, 'but effective as of the 19th day of February, 2008." Do you see that?

A: Yes.

Q: Where did you get that date from?

A: I did not pick that date.  That date was put in by the processor that prepared the assignment.

Q: And who was that?

A: Off the top-of-my-head, I do not know who actually typed this assignment.

Q: Okay.  But you are signing on behalf of MERS, and you are stating here that it is effective as of the 19th day of February, 2008, correct?

A: Correct.

Q: At the time you signed this, what reason did you have, as agent for MERS, to make it effective as of the 19th day of February, 2008?

A: I did not pick that date. And I do not recall this document.

Q: Sitting here today, you have no idea why it is that it says, "effective as of the 19th day of February, 2008." Is that correct?

A: Looking at this one particular piece of paper, I do not recall or know the answer to that question, no.

Q: Is there some general practice, of which you are aware, that would give us information as to why this particular date was inserted?

A: That information was determined by the people that review the file prior to me.

Q: And what would they base that on, as a general practice?

A: I do not know.

Q: You don't know? Were, to your knowledge, any physical documents transferred on February 19, 2008?

A: I do not know.

Q: To your knowledge, does the 19th day of February, 2008 have any significance?

A: I do not know.

Q: Ma'am, if you signed this document on behalf of MERS, picking this date, this effective date - -

A: I did not pick the effective date.

Q: But you ratified it by signing this; didn't you?

[Objection to the form of the question]

Q: Didn't you attest to the accuracy of that date by signing this document?

[Objection to the form of the question]

A: I would say, no.

Q: Did you attest to this document, as a whole, by signing it?

[Objection to the form of the question].

A: I do not think that in my capacity of signing these assignments, it was my position to attest. My role was to be given a document that had been reviewed by an attorney, had been reviewed by a title examiner, had instructions from the client, and I was to sign the assignment as secretary on behalf of MERS.

Q: Right. And when you signed it as secretary on behalf of MERS, were you approving and agreeing with the terms contained therein for MERS?

A: I believe I was approving and agreeing to the fact that the mortgage needed to be assigned from MERS to another entity.

Q: But what about all the other details in here, such as the consideration, the effective date?

13

A: I do not believe that that was my role.

Q: Is there anyone, who signed this assignment of mortgage [who] was, at the time they signed, attesting to or approving all of the terms in it, on behalf of MERS?

A: I do not have an answer to that question.

Q: Why don't you have an answer?

A: Because I do not know what you are thinking needs to be attested to, other than the fact that MERS was not the proper plaintiff, and there needed to be an assignment into Citimortgage to foreclose the mortgage.

Q: What I am thinking needs to be approved or ratified is the terms that are written in this document.

A: Okay.

Q: So did anyone, to your knowledge, approve and agree with all of those terms, on behalf of MERS, in signing this document?

A: I do not have an answer to that question.

Q: If you don't know, then the answer would be "no."

A: Okay. No.[12]

[ . . . . ]

Q: If you could go back, please, to Exhibit 2, the assignment of mortgage. We are on the first sentence of the first paragraph.  You see where it says, "for in consideration of the sum of one dollar" on the second line of that paragraph?

A: Yes. I do.

Q: Did you pay that dollar, or did you receive that dollar?

A: I did not have anything to do with any money exchanging hands on these assignments.

Q: Okay. So when you signed this assignment, did you take any steps to determine whether or not this one dollar actually changed hands?

A: No.

Q: Do you know of any information that would establish that the one dollar did or did not change hands?

A: No.

Q: Who would I ask to find that out?

A: I have no idea.

Q: It says "other good and valuable consideration." Do you see that?

A: I do.

Q: In executing this assignment, for and on behalf of MERS, can you tell me what other good and valuable consideration there was that gave rise to this assignment?

A: No, I cannot.

Q: Do you have any idea, in your capacity as assistant secretary of MERS, who I could contact to find out what the good and valuable consideration was?

A: No.

Q: It says "the receipt of which is hereby acknowledged." Do you see that?

---

[12] Deposition of Cheryl Samons, taken April 29, 2010 in the case of *Citimortgage, Inc. v. Dennis Brown, et al.,* Seventeenth Judicial Circuit case no. 08-011097, pp. 37-41.

A: Yes. I do.

Q: Did you acknowledge receipt of that one dollar and other good and valuable consideration when you signed this document?

A: No.

Q: Can you tell me where, on here, any person signed to acknowledge the receipt of the one dollar and other good and valuable consideration?

A: No.

Q: So when it says, "the receipt of which is hereby acknowledged," is that an error?

A: I have no idea.

Q: Is there anybody who would have more information about this transaction reflected in this assignment, other than you?

A: No.[13]

21.     The Defendants, by working in concert through the use of the MERS artifice,

succeeded in obtaining final judgments of foreclosure against the Class Members and in favor of

plaintiffs whose standing was nil, both substantively and technically.   These final judgments led to

foreclosure sales pursuant to which the Class Members were dispossessed of their properties.   While

each case proceeded along different routes, depending on whether the  homeowners attempted to

defend on their own, hired counsel, or simply allowed default to be entered, the end result was the

same:  The Class Members  were robbed of their properties.  The RICO enterprise herein complained

of was the proximate cause of these damages.

22.     Defendant Merscorp, Inc., maintained (and is believed to still maintain) a relationship

with the Defendant Firm including written contracts and alleged corporate resolutions designed to

assist the Defendant Firm in effectuating the goals of the criminal enterprise through use of the

assignments. Attached hereto as Exhibit E is an "Agreement for Signing Authority" and associated

Merscorp resolution purporting to authorize Ms. Samons and other employees of the Defendant Firm

to sign legal documents as if they had actual authority to act for Merscorp, and as if Merscorp or

---

[13] Deposition of Cheryl Samons, taken April 29, 2010 in the case of *Citimortgage, Inc. v. Dennis Brown, et al.,* Seventeenth Judicial Circuit case no. 08-011097, pp. 25-27.

MERS had any actual interest in the properties.  This document  is an example of the relationship between the Defendants, and it typifies the Defendants' sophisticated approach.  By using one untruth to lay a foundation, and then utilizing additional lies to add to it, the Defendants sought to obtain acceptance for entire constructs of deceit designed to serve their illegal purposes.  Exhibit E follows this blueprint: it establishes a false baseline and then adds on with new falsehoods.  First of all, since Merscorp, Inc. at no time possessed any true beneficial interest in the properties, it could not dispose of them even if it acted on its own behalf because it had no interests to convey.  The "Agreement for Signing Authority" presumes that it owns beneficial interests in the subject properties, and then purports to grant autonomy to an employee of the Defendant Firm to alienate its non-existent interests.  Even if Merscorp, Inc.,  had actually owned some interest, execution of the assignments by employees of a law firm having no personal  knowledge of the transactions described therein could not have, and cannot, attest to the veracity of the assignments or bestow sufficient trustworthiness on the documents to qualify them as legally competent evidence of standing to foreclose. Each and every final judgment of foreclosure entered in favor of one of these Stern/Mers strawmen plaintiffs was obtained illegally. Finally, in contradiction with the ownership proclamation contained on www.mersinc.com and addressed in paragraph 13, *supra*, in Exhibit E the parties make the representation that MERS is owned entirely by Merscorp, Inc.

23.     The preparation, filing, and prosecution of the complaints to "Foreclose Mortgage and to Enforce Lost Loan Documents" were each predicate acts in the pattern of racketeering activity herein complained of, and were actions taken in furtherance of the MERS enterprise.  The actions could not have been brought by the Defendant Firm without the MERS artifice and the ability to generate any necessary "assignment" which flowed from it.  Just like MERS, the assignments were

meaningless shells designed to pull the wool over the eyes of the judiciary and ease the burden upon

the unknown real parties in interest.  The practice of "non-documentation" can be seen as a common

thread weaving all of the complained-of conduct into an undeniable tapestry of a criminal enterprise

proscribed by RICO.

**The Class**

24.     The Class Members have the following in common:

a)      Each owned Florida real property which was encumbered by a mortgage
        listing "MERS" as "mortgagee;"

b)      Each suffered the loss of all right, title and interest in his or her property by
        operation of an adverse final judgment in a civil action for foreclosure in
        which the plaintiff was represented by the Defendant Firm);

c)      The foreclosure actions brought against the Class Members were
        fraudulently prosecuted in the name of plaintiffs which were NOT the real
        parties in interest and which had no legal right to bring suit to foreclose or
        to obtain final judgment.

25.     Joinder of Class Members as individual plaintiffs would be totally

impractical, as their number is believed to be in the tens of thousands.  This, and the other

applicable criteria, support the certification of this Class by the Court.

**Count 1 - Violation of 18 U.S.C. §1962 [c] -**
**Law Office of David J. Stern, P.A. and David J. Stern**

26.     Plaintiff re-alleges paragraphs 1, 2, and 4-25 here.

27.     By engaging in a pattern of racketeering activity, specifically "mail or wire fraud,"

the Defendants subject to this Count participated in a criminal enterprise affecting interstate

commerce.  In addition to the altered postmarks described below, the mail fraud is the sending of the

fraudulent assignments and pleadings to the clerks of court, judges, attorneys, and defendants in

foreclosure cases.  These Defendants intentionally participated in a scheme to defraud others,

including the Plaintiff and the other Class Members, and utilized the U.S. Mail to do so.

17

28.     The criminal enterprise was and is MERS, which affects interstate commerce in numerous ways.  It is used to conceal  the true ownership of mortgage loans from the general public, including investors, borrowers, and the courts.   Were it not for MERS, investors would be enabled to have a clearer picture of the assets and debts of large banking and financial institutions in which they may consider investing.  Furthermore, the entire American economy has been affected by the conspiracy described in this Complaint, which is exemplified by the MERS enterprise.  The foreclosure crisis and larger economic downturn were substantially contributed to, and are believed to have been <u>caused</u>, by the MERS enterprise and underlying conspiracy.

29.     The "predicate acts" of fraud, which were accomplished through the U.S. Mail, and which are specifically attributable to the Defendants subject to this Count, are:

a.      <u>Bringing suit on behalf of entities which were not the real parties in interest, and which had no standing to sue.</u>  This involved, and involves, the use of the MERS artifice.

b.      <u>Actively concealing the plaintiffs' lack of standing in their standard complaints for foreclosure, usually entitled, "Complaint to Foreclose Mortgage and to Enforce Lost Loan Documents."</u>  (Exhibits A and B).  It is believed that in 80% or more of these complaints filed by the Defendant Firm, it was asserted that the original loan documents had mysteriously been "lost."  The Defendant Firm slightly  adjusted the standard complaint over time, as problems and obstacles arose, to improve its chances for success and perfect or improve the concealment of the real party or parties in interest.   The Defendant Firm attached to these fraudulent complaints the mortgage containing the MERS provisions quoted above. While the title of the standard complaint makes reference to "lost loan documents," in body of the standard complaint, the Defendant Firm alleges that the plaintiff is the "owner and holder" of the note and mortgage."  Both cannot be true unless

the words used are given new meanings.  (Exhibit A).  Sometime after March 13, 2008, but before February 12, 2009, the Defendant Firm changed the standard Complaint so that it now reads: "Plaintiff, as servicer for the owner and acting on behalf of the owner with authority to do so, is the present designated holder of the note and mortgage with authority to pursue the present action."  Yet in the latest version, the Stern Firm describes an assignment of the mortgage which has already occurred, with the "assignee" being the plaintiff in the case - - the same plaintiff who is simultaneously described as a "designated holder" who is "acting on behalf of the owner." (Exhibit B). This is a contradiction: either the plaintiff is designated to act on behalf of the real party in interest, or it is itself the real party in interest pursuant to the alleged "assignment."

       c.    <u>Providing misleading authorship information and omitting the dates of foreclosure complaints.</u>  Normally, state court complaints filed in Florida contain the date they were signed by the plaintiff's attorney on the last page, in the vicinity of the attorney's signature.  The foreclosure complaints filed by the Defendant Firm usually  contained no date on the last page to signify when they were signed, and usually appeared to be signed by some person, whose signature was illegible, on behalf of the attorney whose name appeared in the signature block.

       d.    <u>Convincing *pro se* Defendants to agree to a "sale date" sometime far in the future, thereby obtaining summary judgment from the Court without any opposition.</u>  At the date and time for the hearing on a foreclosure plaintiff's motion for summary judgment, attorneys employed by the Defendant Firm often pull the defendants aside in the hallway outside the courtroom and speak in seemingly conciliatory and reasonable terms. They act as if they are assisting the homeowner.  They inform the *pro se* defendant something along the lines of, "If you like, to give you time, I can ask the court for an extended sale date."  (The amount of time offered is usually 90-120 days).  The attorney indicates that this is a concession to allow the homeowner time to continue

19

his or her efforts to "modify" the mortgage with the "lender." The attorney then often goes into the courtroom and informs the Court that, "we have reached agreement on the motion, the defendants are asking for a 120-day sale date, and we have no objection." Modification never is consummated and the defendants' properties are sold at foreclosure sale. In this way the representatives of the Defendant firm minimize challenges to the plaintiff's entitlement to summary judgment.

e.       Creating, executing, and filing fraudulent "assignments." These documents were executed by an "Assistant Secretary" or "Vice President," apparently of MERS. In reality, the person executing the assignments had no knowledge whatsoever of the truth of their contents, and was simply an employee of the Defendant Firm. (Samples attached as Exhibit D).

f.       Altering common hardware and/or software used by the Defendant Firm so that envelopes used to mail important legal documents, such as final judgments, to defendants contain no date of mailing in the postmark and intentionally delaying in sending the mail until defendants have lost their rights. (Exhibit F). These predicate acts constitute "mail fraud."

30.     These predicate acts are related. They share the common purpose of defrauding the Class Members and other borrowers of their money and property. They share the common themes of "non-documentation" and concealment of the real parties in interest.

31.     The predicate acts satisfy the RICO continuity requirement: they extend from in or about 1998 through today and continue unabated, which meets the definition of "open-ended" continuity. The threat of continued criminal activity as part of this enterprise in, without question, still looming over the American economy. Here is an explanation from David J. Stern of the continuing foreclosure rout:

> One of my favorite questions from one of my believers, one of my investors on the first call-in, "What inning are we in? If this was a baseball game, what inning are we in?" And my response is, we're only in the 2nd inning. We still have 3 innings of foreclosures left, and after the foreclosures, we have 3 innings of REO liquidation

and as the REO liquidations pan out, we get into the re-fi and we get into the origination.

[ . . . ]

So yeah, we're in the 2nd inning, but guess what - when we get to the 9th inning, it's going to be a doubleheader and we got a second game coming. So when people say, "Oh my God, the economy is bad!" I'm like, "Oh my God, it's great." I mean, I hate to hear people are losing their homes and credit isn't available and credit is such that they can't re-fi, but if you are in our niche, it's what we do and it's what we want to see.

Www.americansunitedforjustice.org/stern.html.  Alternatively, closed-ended continuity is present because the scheme occurred over a period in excess of ten years.

32.     As the result of the RICO enterprise of which these actions were part, the Class Members have suffered damages, in that they have lost their homes.  The measure of the damages for the Class Members is the average of the accelerated amounts demanded from the Class Members by the Defendant Firm in the subject complaints "to Foreclose Mortgage and to Enforce Lost Loan Documents."  Since the real parties in interest had already been paid, the mortgages were truly not subject to being foreclosed upon, and the fair market value of the properties at the time of foreclosure is for this reason the measure of the damages suffered by the Class Members.  To provide an example, if the average value of the properties was $250,000.00, and the Class is comprised of 10,000 persons, the initial damages to which the Class is entitled by law would be $2,500,000,000.00, or 2.5 billion dollars.  This amount is then tripled by operation of the RICO law, so that, without reference to attorney fees and costs, the total damages awarded would be 7,500,000,000.00, or 7.5 billion dollars.

33.     The Class Members are entitled to judgment in the amount of three times their actual damages, which should be arrived in the manner indicated in the preceding paragraph. plus costs and a reasonable attorneys' fee under 18 U.S.C. §1964[c],

WHEREFORE, the Plaintiff, on behalf of the Class Members, demands judgment against the Defendants, jointly and severally, for the total damages sustained by the Class, plus costs, attorneys' fees, and such additional relief as the Court or jury may deem just and proper, including imposition of liability on the members of the conspiracy not presently named as Defendants in this action.

PLAINTIFF DEMANDS TRIAL BY JURY ON COUNT 1

**Count II - Violation of 18 U.S.C. §1962 [c] - Defendant Merscorp, Inc.**

34.     Plaintiff incorporates paragraphs 1 through 3 and 6 through 25 here.

35.     Merscorp, Inc. was created in or about 1998, and its purpose, from the outset, was to enact the fraudulent scheme/RICO enterprise herein complained of. Its overt acts include the following:

a)      Creation of the MERS artifice;

b)      Planning, designing, and enacting the MERS criminal enterprise of which Plaintiff complains herein;

c)      Arranging for the use of the MERS as "mortgagee" in the standard mortgages at issue;

d)      Drafting of the standard MERS language to be included in such mortgages;

e)      Entering into one or more "agreements for signing authority" which purported to allow employees of the Stern firm to execute assignments in which the "assignor" and "assignee" are strawmen actually not possessed of the capacity stated, and of which the person executing the document has no knowledge;

22

    f)      Creation and maintenance of an acceptable public image for MERS;

    g)      Owning and maintaining the registration and licensure of the MERS entity, Mortgage Electronic Registration Systems, Inc, with the necessary state agencies, plus other ministerial acts designed to maintain the corporate shield and to mimic the actions expected of normal corporations so as to fraudulently disguise its true nature.

    h)      Facilitating the use of the MERS artifice by other participants in the scheme.

36.     These predicate acts are related. They share a common purpose, defrauding the Class Members and other borrowers of their money and property. They share the common themes of "non-documentation" and concealment of the real parties in interest.

37.     The predicate acts satisfy the RICO continuity requirement: they extend from in or about 1998 through and continue unabated at the present time, which meets the definition of "open-ended" continuity. In the alternative, the participants in the RICO enterprise engaged in a pattern of racketeering activities continuously for a period of time exceeding ten years in duration, which as a matter of law suffices to establish "closed-ended" continuity.

38.     As the result of the RICO enterprise of which these actions were part, the Class Members have suffered damages, in that they have lost their homes. The measure of the damages for the Class Members is the average of the accelerated amounts demanded from the Class Members by the Defendant Firm in the subject complaints "to Foreclose Mortgage and to Enforce Lost Loan Documents." Since the real parties in interest had already been paid, the mortgages were truly not subject to being foreclosed upon, and the

fait market value of the properties for this reason is the measure of the damages suffered by the Class Members.  The manner in which damages should be calculated is set forth in paragraph 32, *supra*, and is incorporated here by reference.

39.    The Class Members are entitled to judgment in the amount of three times their actual damages, which should be arrived at using the formula set forth in said paragraph, plus costs and a reasonable attorneys' fee under 18 U.S.C. §1964[c].

WHEREFORE, the Plaintiff, on behalf of the Class Members, demands judgment against the Defendants, jointly and severally, for the total damages sustained by the Class, plus costs, attorneys' fees, and such additional relief as the Court or jury may deem just and proper,  including imposition of liability on the members of the conspiracy not presently named as Defendants in this action.

PLAINTIFF DEMANDS TRIAL BY JURY ON COUNT 2

Respectfully submitted this 26th day of July, 2010.

KENNETH ERIC TRENT, P.A.
Attorney for Plaintiff
831 East Oakland Park Blvd.
Fort Lauderdale, FL 33334
(954)567-5877; (954)567-5872
trentlawoffice@yahoo.com


By: /s   Kenneth Eric Trent
        Fla. Bar No. 693601