UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**CASE NO. 10-61296-CIV-ALTONAGA/Brown**

**IGNACIO DAMIAN FIGUEROA**,

      Plaintiff,

vs.

**MERSCORP, INC.**, *et al.*,

      Defendants.

_____/

## <u>ORDER</u>

**THIS CAUSE** comes before the Court upon Defendants'[1] Consolidated Motion to Dismiss

Plaintiff's Third Amended Complaint (the "Motion") [ECF No. 162], filed on December 2, 2010.

Defendants seek to dismiss Plaintiff, Ignacio Damian Figueroa's ("Figueroa['s]") Third Amended

Complaint [ECF No. 112] (the "Complaint") pursuant to Federal Rules of Civil Procedure 12(b)(1)

and 12(b)(6).  The Court has carefully considered the parties' written submissions and applicable

law.

---

[1]  The Defendants are Bank of America, N.A.; CitiMortgage, Inc.; Corinthian Mortgage Corp.; EverHome Mortgage Company; Fannie Mae; First American Title Insurance Company; Freddie Mac; HSBC Finance Corporation; JPMorgan Chase & Co.; MERSCORP, Inc.; Merrill Lynch Credit Corporation; MGIC Investor Services Corporation; Mortgage Bankers Association; Nationwide Advantage Mortgage Company; PMI Mortgage Insurance Co.; David J. Stern; Law Offices of David J. Stern, P.A.; Stewart Title Guaranty Company; SunTrust Mortgage, Inc.; United Guaranty Corporation; and Wells Fargo Bank, N.A..

Case No. 10-61296-CIV-ALTONAGA/Brown

## I.  BACKGROUND[2]

### A.  The State Court Action to Foreclose

On September 5, 2006, Timothy J. Brown ("Brown") took out a $231,200 loan from Loan America, Inc. in order to purchase a home (the "Property").  On the same day, he also executed a mortgage note naming Mortgage Electronic Registration System[3] ("MERS") as mortgagee.  The mortgage stated MERS held legal title to and had the power to foreclose and sell the Property.  After completing these transactions, Brown quitclaimed all interest in the property to Figueroa and himself as joint tenants with the right of survivorship.

A little over two years later, on February 12, 2009, IndyMac Federal Bank FSB ("IndyMac"), through its retained counsel — Defendant Law Offices of David J. Stern, P.A. (the "Firm"), sued Figueroa and Brown in Florida circuit court to foreclose on the Property.  (3d Am. Compl. 15–16[4] [ECF No. 112]).  Erroneously believing he had not been properly served, Figueroa failed to respond to the foreclosure complaint.  (*See id.* 17).

---

[2]  As is further explained in Section II of this Order, because Defendants move to dismiss the Complaint in part under Federal Rule of Civil Procedure 12(b)(1), the Court may consider matters outside the pleadings, and no presumption of truth attaches to Plaintiff's allegations.

[3]     In 1993, the MERS system was created by several large participants in the real estate mortgage industry to track ownership interests in residential mortgages.  Mortgage lenders and other entities, known as MERS members, subscribe to the MERS system and pay annual fees for the electronic processing and tracking of ownership and transfers of mortgages. Members contractually agree to appoint MERS to act as their common agent on all mortgages they register in the MERS system.

*MERSCORP, Inc. v. Romaine*, 8 N.Y.3d 90, 96 (N.Y. 2006) (footnote call numbers omitted).

[4]  Citations to the Complaint are to page numbers and not paragraph numbers, as two sets of paragraphs numbered 69 to 82 appear in the Complaint.

Case No. 10-61296-CIV-ALTONAGA/Brown

IndyMac moved for summary judgment on September 14, 2009. (*See* Mot. Ex. A, 21–23[5] [ECF No. 162-1]).  The motion was based on Figueroa's and Brown's failure to make payments on the mortgage and note, rendering them in default under the note's terms. (*See id.* 21).  As a result of the nonpayment, the entire amount due was accelerated and immediately payable. (*See id.*).  In support of its motion, IndyMac submitted four affidavits which attested to the amounts owed. (*See id.* 24–30).  Additionally, Roger Stott of IndyMac averred that IndyMac had the original note in its possession. (*See id.* 25).

Four months after IndyMac filed its motion, on January 14, 2010, Brown filed a motion to dismiss for lack of subject matter jurisdiction. (*See id.* 18–20).[6]  This motion stated that IndyMac was not the "true owner of the claim sued upon [,] . . . [was] not the real party in interest and [was] not shown to be authorized to maintain [the] foreclosure action." (*Id.* 18).  This argument was based on Brown's assertion that IndyMac neither owned nor held the subject mortgage and note. (*See id.*).  Rather, he asserted these interests had been assigned away.  Brown maintained there was no evidence to establish who was the correct plaintiff, and that IndyMac and the Firm did not identify the true owner of the debt. (*See id.* 19–20).

Despite Brown's motion, the Florida court granted IndyMac summary judgment on February 1, 2010. (*See id.* 13–17).  The state-court order was concise, simply stating it was based on the motion and affidavits. (*See id.* 13).

---

[5]  Because this Exhibit is a composite of several state-court filings, the page citations refer to the "Merscorp" page numbers inserted by Defendants in the exhibit.

[6]  Figueroa did not join this motion.

3

Case No. 10-61296-CIV-ALTONAGA/Brown

After the Florida court entered summary judgment, Brown and Figueroa filed a *pro se* emergency motion to vacate the judgment and to stop the impending foreclosure sale. (*See id.* 7–12). They made several arguments, including that IndyMac had committed fraud by engaging, with others, in a pattern of deception to foreclose on residential properties even after having been paid in full. (*See id.* 7). The motion also resurrected Brown's earlier argument that IndyMac was not the proper party to bring the foreclosure suit. (*See id.* 7–12). Figueroa and Brown further urged that documents attached to the foreclosure complaint conflicted with allegations and material facts in the complaint. (*See id.* 8). After explaining why they believed IndyMac was not the proper party to foreclose, they stated that if the judgment was vacated, they intended "to file affirmative defenses for set off violations to the Truth in Lending Act, and a counterclaim for damages for RICO, TILA violations, usury, fraud in the inducement and fraud in the execution, damages for appraisal fraud, quiet title, and malicious abuse of process among other causes of action." (*Id.* 10). This motion was denied on February 25, 2010. (*See id.* 1).

After filing the emergency motion, Brown and Figueroa secured counsel who filed a subsequent motion to vacate the foreclosure judgment on February 22, 2010. (*See id.* 2–6). That motion argued summary judgment was inappropriate because there were material issues of fact. (*See id.* 2–6). The supposed issues included whether IndyMac owned the note and mortgage, and whether IndyMac had committed fraud in the foreclosure process. (*See id.* 2–3). Additionally, the motion raised the question of whether the Florida Rules of Civil Procedure, as amended, addressed and barred IndyMac's claim on standing grounds. (*See id.* 4). The Florida court denied this motion as well. (*See* 3d Am. Compl. 17). Following the denial of these motions, no appeal was taken, and the

4

Case No. 10-61296-CIV-ALTONAGA/Brown

property was sold at auction on April 8, 2010.  (*See id.*).

**B.  The Present Suit**

Roughly three months after losing the Property, Figueroa filed this federal suit, a purported class action.  (*See* [ECF No. 1]).[7]  He thereafter filed an Amended Complaint [ECF No. 11], Second Amended Complaint [ECF Nos. 21, 28], and following the receipt of numerous motions to dismiss filed by the Defendants, the present Third Amended Complaint.  The current Complaint sets forth three claims, all violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.  (*See* 3d Am. Compl. 23–44).  The Complaint names 27 Defendants that fall into three general groups — Merscorp, Stern and his Firm, and those named solely because they are MERS shareholders.  (*See id.* 2–7).

Figueroa alleges the underlying scheme arose out of new mortgage products first introduced in the late 1990s, including non-documentation loans and adjustable-rate mortgages.  (*See id.* 7).  At the same time, lenders allegedly relaxed their lending standards, allowing lower-income persons to receive loans.  (*See id.*).  According to the Plaintiff, MERS was then "created to facilitate the illegal and fraudulent foreclosure of properties that are otherwise immune from repossession."  (Mot. 9 (citing 3d Am. Compl. 2, 11, 18–19, 24–27, 35–36)).

Either prior to executing the mortgages or soon thereafter, Plaintiff alleges that the "true lenders," unnamed in the loan documents, sold the loans in "secretive transactions" without the borrowers' knowledge.  (3d Am. Compl. 11).  The only notice borrowers received was that their servicers had changed.  (*See id.*).  Figueroa contends that by constantly changing servicers, bankers

---

[7]  Brown is not a named party in this action.

5

Case No. 10-61296-CIV-ALTONAGA/Brown

obscured the truth as to who held the right to the loans' proceeds and who held the right to foreclose. (*See id.*). And, according to Plaintiff, because loans were pooled, sold, and continually resold, this "atomized" the true beneficial interests[8] and made it so *no* party would ever have the legal right to foreclose on the underlying properties.[9] (*Id.* 18).

Figueroa maintains that in drafting the mortgage documents and engaging in these additional transactions, Defendants began to use words in new ways — "inconsistent with their traditional meanings" — and created novel terms to blur the lines between parties and their interests. (*Id.* 11). This aspect of the alleged scheme was supposedly part of a "smokescreen" to prevent consumers and lawyers from ever discovering who was actually receiving the mortgage payments' benefits. (*Id.* 12). And the result, according to Figueroa, is that important terms devolved into a "state of meaninglessness." (*Id.*). He claims that mortgages and their related documents mean whatever the alleged schemers want them to mean. (*See id.*).

The Complaint states that as part of the scheme, and to avoid jurisdictional issues such as standing, the Firm and Merscorp would manufacture lies to complete the foreclosures. (*See id.* 13). For example, if the standing issue became highly contested, Figueroa contends the Firm would create ambiguous and fraudulent assignments to overcome this problem. (*See id.*). Moreover, Figueroa alleges that persons executing the assignments and other documents — now known as "robo-signers"

---

[8] Plaintiff often conflates the legal and beneficial interests in the mortgages and notes, as well as the rights that attach to each interest.

[9] An example of the complexity of these transactions and assignments can be seen in "Dan and Teri Securities Transaction Process . . . ." This is available at http://msnbcmedia.msn.com/i/CNBC/Sections/News_And_Analysis/__Story_Inserts/graphics/__CHARTS_SPECIAL/NET_NET/Edstrom_Mortgage Securitization_poster.pdf.

Case No. 10-61296-CIV-ALTONAGA/Brown

— lacked any knowledge as to the truth or falsity of statements therein, yet signed them anyway. (*See id.* 13–14). The robo-signers held "bogus" titles provided by MERS "corporate resolutions," which were supposedly phony themselves. (*Id.*). These resolutions were automatically created by MERS upon receipt of an email from a "foreclosure mill" naming the person requiring the title. (*Id.*). Plaintiff states the robo-signers effectuating the assignments were part of the relationship between Merscorp and the Firm. (*See id.*).

Through the described fraudulent activity, Defendants were then allegedly able to obtain final foreclose judgments against Plaintiff and other potential class members. (*See id.*). As a result of these judgments, Figueroa claims he and the class members were "robbed" of their properties. (*Id.*). Plaintiff asserts Merscorp and the Firm were complicit in this theft through their involvement in fraudulent assignments. (*See id.* 14). The Firm's employees signed legal documents as if they had actual authority to act for Merscorp, and as if Merscorp and MERS had a real interest in the properties. (*See id.* 14–15). Plaintiff, however, claims Merscorp and MERS had neither the authorization nor the interest. (*See id.* 14–15). Specifically, Plaintiff contends Merscorp lacked any "beneficial" interest in the properties, and as such, could not effectuate assignments. (*Id.* 15). Moreover, even if Merscorp had an interest, according to Plaintiff, the foreclosures would still be improper because the persons executing the assignments lacked personal knowledge and could not attest to their truth, or "bestow sufficient trustworthiness on the documents to qualify them as legally competent evidence of standing to foreclose." (*Id.*). Figueroa concludes that as a result, assignees received no actual interest. (*See id.*). And therefore all of the final foreclosure judgments entered in favor of the Firm's or MERS's "strawmen plaintiffs" were fraudulently and illegally obtained, and

Case No. 10-61296-CIV-ALTONAGA/Brown

were "proximately caused" by the scheme and the RICO predicate acts.  (*Id.*).

Figueroa alleges the mails and wires were used in furtherance of the scheme to defraud him in his foreclosure case and constitute "predicate acts" as defined by RICO.  He contends the mails were used by the Firm to mail letters, notes, and assignments to the clerk of court for the Florida Seventeenth Judicial Circuit concerning his case.  (*Id.* 17–18).  These actions were allegedly in furtherance of the RICO enterprise because they were "directed toward obtaining a final judgment of foreclosure to which the plaintiff, represented by [the Firm] was not entitled."  (*Id.*).

As a result of the alleged RICO scheme, Plaintiff claims he was injured by losing his one-half interest in the Property.  (*See id.* 18).  His injury was proximately caused by the alleged fraudulent scheme in which the mails were used.  (*See id.*).  Had the Firm not used the mails, he asserts, the foreclosure would not have ended in an adverse final judgment.  (*See id.*).  And finally, because there was no real party in interest that could legitimately bring the foreclosure or legitimately assign rights to the Property, Plaintiff claims damages.  (*See id.*).

**C.  Figueroa's Claims**

Figueroa asserts three claims, all violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.

### 1.    Count I – Violation of 18 U.S.C. § 1962(c) against the Firm and David J. Stern

Figueroa maintains that the Firm and Stern were employed by and associated with MERS — which constitutes the alleged RICO enterprise.[10]  (*See id.* 23).  Stern is the owner of the Defendant

---

[10]  An "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

8

Case No. 10-61296-CIV-ALTONAGA/Brown

Firm, as well as other entities. (*See id.* 36). He is a licensed attorney who directed the robo-signers working for the Firm. (*See id.* 36–37). Figueroa contends any actions taken on behalf of MERS were part of the RICO enterprise. (*See id.* 23). And when the mails or wires were used in those actions, the affairs were being conducted "through a pattern of racketeering activity." (*Id.*). Figueroa also asserts the Firm represented MERS with the preparation and execution of fraudulent assignments. (*See id.*). In that representation, the Firm allegedly generated fraudulent assignments, foreclosure complaints, pre-suit default notices, and demand letters, which were then sent through the mails and wires in furtherance of the scheme. (*Id.* 24). This use of the mails and wires, according to Figueroa, constituted mail and wire fraud, and racketeering activity. (*See id.*).

With reference to Figueroa's own foreclosure, he alleges certain RICO predicate acts of mail and wire fraud, maintaining the mails were used in filing mortgage notes and mortgage assignments, and the wires were used in communications between Stern, the Firm, MERS, and Merscorp. (*See id.* 25–26). Figueroa asserts these actions were in furtherance of the RICO enterprise and conspiracy in that they were directed toward obtaining a final foreclosure judgment when IndyMac as plaintiff, represented by Stern and the Firm, was not entitled to one. (*See id.*).

In addition to the foregoing, Figueroa contends the Firm and Stern engaged in other overt acts in furtherance of the conspiracy. (*See id.* 27). These acts included: concealing the foreclosure-plaintiffs' lack of standing; "[p]roviding misleading authorship information" and omitting foreclosure complaints' dates; using misleading language and "artificially friendly mannerisms" prior to summary judgment hearings to convince *pro se* defendants to agree to sale dates far in the future and then obtaining summary judgments without opposition; participating in fraudulent assignments;

9

altering hardware and software to remove mailing dates from the postmarks on legal documents and then delaying mailings until after defendants had waived their rights; and mailing motions and court documents in a manner "designed to facilitate the illegal thefts of properties." (*Id.* 28).

According to Figueroa, these predicate acts satisfy the RICO continuity requirement as they extend from 1999 through the present, and continue "unabated." (*Id.* 29). Even if MERS and Merscorp are no longer working with Stern and the Firm, they worked together from at least 2004 to 2009.[11] (*See id.*). Whether or not they are currently "officially" linked, however, Figueroa maintains that Stern and the Firm continue to file and prosecute foreclosures of MERS mortgages on behalf of "entities" who are not true parties in interest. (*Id.*). Figueroa thus asserts that Stern and the Firm continue to "engage in a pattern of racketeering activity in furtherance of the scheme to defraud, even *if* their official relationship with MERS and Merscorp, Inc. has ended." (*Id.*) (emphasis in original).

As a result, Figueroa claims damages because he and purported class members have lost their homes. (*See id.*). He maintains the mortgages were not truly able to be foreclosed upon. (*See id.* 30). Figueroa seeks on the behalf of the class the fair market value of the lost properties as the measure of damages, tripled under RICO, for total damages of $7.5 billion. (*See id.*).

## 2.  Count II – Violation of 18 U.S.C. § 1962(c) against Merscorp

Figueroa alleges that when Merscorp was created in 1998 the objective was to devise the fraudulent scheme and RICO enterprise outlined in the Complaint. (*See id.*). At the outset,

---

[11] Other parts of the Complaint assert that Stern, the Firm, and Merscorp joined the RICO enterprise in 1999. (*See, e.g.*, 3d Am. Compl. 3). Plaintiff is careless with dates, often making it confusing as to when he alleges certain acts began or occurred.

Case No. 10-61296-CIV-ALTONAGA/Brown

Merscorp was MERS. (*See id.*). Later, after a "replica MERS" was created, the second (of three) MERS was transformed into Merscorp. (*Id.*). While Merscorp now asserts that MERS is its wholly-owned subsidiary, the MERS website lists multiple shareholders, all of which are Defendants in this action. (*See id.* 30–32).

Currently, Merscorp generates all of MERS's corporate resolutions. (*See id.* 30). These resolutions authorize employees of foreclosure mills to sign sworn documents despite allegedly lacking personal knowledge. (*See id.*). According to the Plaintiff, this is done to facilitate foreclosures. (*See id.*).

Figueroa asserts that in forming MERS, the conspirators commenced a plan devised to defraud. (*See id.* 31). The plan prevented borrowers, investors, and governments from identifying the actual beneficial owners of any collateralized loan. (*See id.*). The true beneficial owners, through MERS, became "private information" that was unavailable to anyone. (*Id.*). MERS then became a "sham beneficiary" with the unlawful intent of preventing Figueroa and other "victims" from identifying and holding accountable those behind the "industry-wide predatory practices and policies." (*Id.*).

According to the Complaint, whenever MERS acts, Merscorp is the real actor.[12] (*See id.*). And when Merscorp acts in furtherance of the scheme and fears "accountability," it hides behind a "'MERS' disguise." (*Id.*). Because MERS has no employees — and may have never had any — it must always act through other entities. (*See id.*). Thus, Figueroa maintains "each and every" time

---

[12] The Complaint repeatedly switches between the past and present tenses. Some acts allegedly occurred while others are alleged to be ongoing.

MERS has acted, it was really Merscorp wearing its MERS disguise.  (*Id.*).

Figueroa contends that Merscorp "commits numerous predicate acts of mail and wire fraud each and every business day."  (*Id.* 32).  These acts allegedly occur when Merscorp sends and receives documents through "MERS mail," which operates through the U.S. mail and over the wires. (*Id.*).  Because Merscorp and MERS allegedly communicate over the wires about authorizing robo-signers and other fraudulent transactions, these actions affect interstate commerce, constitute wire fraud and a pattern of racketeering activity, and Merscorp should be held liable.  (*See id.* 33).

Figueroa also alleges Merscorp has engaged in other "overt activities in furtherance" of the alleged fraud and RICO violations.  (*Id.* 34).  These activities include:  "[p]lanning, designing, and enacting the MERS criminal enterprise"; making the use of MERS as the mortgagee in the mortgages at issue; drafting the MERS language to include the subject mortgages; entering "agreements for signing authority"; creating and maintaining the MERS public image; owning and maintaining the MERS license with state agencies; and facilitating the use of MERS by other scheme participants.  (*Id.* 34–35).  According to the Complaint, all of the predicate acts began in 1998[13] and continue through the present.  (*See id.* 35).  The acts damaged Plaintiffs because they lost their homes, and, as with the first claim, Figueroa seeks $7.5 billion in damages.

### 3.    Count III – Violation of 18 U.S.C. § 1962(d) Against all Defendants Except the Firm

The overarching conspiracy alleged in the third claim is that the Defendants conspired to commit fraud and used the U.S. mails to facilitate it, with the ultimate goal of stealing "real

---

[13]  The Complaint lists different years that RICO predicate acts allegedly began.  (*See, e.g.*, 3d Am. Compl. 27, 29, 35).

Case No. 10-61296-CIV-ALTONAGA/Brown

properties through illegal foreclosures . . . ."  (*Id.* 36).

Figueroa alleges Stern has been a conspirator since 1999.  (*See id.* 37).  Stern's alleged participation included ordering Firm employees to act on behalf of MERS, and those employees received their purported authority from fraudulent documents transmitted through the mails and wires.  (*See id.*).  Plaintiff further insists these actions only occurred because of Stern's "awareness and assent to the goals of the RICO enterprise."  (*Id.*).

Plaintiff states Merscorp and the other shareholders were also conspiracy members. Merscorp was allegedly involved in the conspiracy as "established inferentially by virtue of the fact that it claims MERS as its subsidiary, and by the fact that it takes actions in the name of MERS." (*Id*).  Likewise, the other Defendants are alleged to have participated in the conspiracy by virtue of their status as shareholders, initial investors, and MERS members.  (*See id.* 37–43).  Through these relationships, Defendants supposedly "furthered and continue[] to further the goals of the conspiracy and therefore as a matter of law [their] complicity therein may be inferred."  (*Id.* 43).  But Figueroa concedes that due to "contradictory information" he cannot tell whether the Defendants are shareholders of Merscorp, MERS, or both.  (*Id.*).  Figueroa asserts, however, that it is not coincidental these Defendants are co-conspirators in the MERS scheme as the Firm represents many of them.  (*See id.*).

Figueroa insists the Defendants have RICO liability because they supported an illegal enterprise.  (*See id.*).  As shareholders, they participated — directly or indirectly — in that enterprise. (*See id.*).  This is emphasized by the Merscorp website, which states that "[s]hareholders played a critical role in the development of MERS.  Through their capital support, MERS was able to fund

Case No. 10-61296-CIV-ALTONAGA/Brown

expenses related to development and initial start-up." (*Id.*).  Consequently, Figueroa maintains he

should be able to pierce the MERS corporate veil and hold the shareholder-Defendants liable for the

actions of MERS and other scheme participants.  (*See id.*).

As a result of the conspiracy, Figueroa alleges he and the other putative class members were

damaged though the "illegal divest[ment]" of their real properties.  (*Id.* 44).  The same damages are

sought in this count as in the other two counts — $7.5 billion.  (*See id.*).

Defendants now move to dismiss the Complaint, in part, pursuant to Federal Rule of Civil

Procedure 12(b)(1).

## II.  LEGAL STANDARD

A defendant may attack subject matter jurisdiction under Rule 12(b)(1) in two ways — a

facial attack or a factual attack.  A facial attack asserts that a plaintiff has failed to allege a basis for

subject matter jurisdiction in the complaint.  *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507,

511 (5th Cir. 1980).  In a facial attack, the plaintiff's allegations are taken as true for the purposes

of the motion, *see id.*, and the plaintiff is afforded safeguards similar to those provided in challenging

a Rule 12(b)(6) motion.  *See Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).

On the other hand, a factual attack "challenges the existence of subject matter jurisdiction

in fact, irrespective of the pleadings, and matters outside the pleadings such as testimony and

affidavits, are considered." *Menchaca*, 613 F.2d at 511.  In a factual attack, courts are free to weigh

the evidence to satisfy themselves they have the power to hear the case.  *See Lawrence*, 919 F.2d at

1529.  No presumption of truth attaches to the plaintiff's allegations, and the existence of disputed

material facts does not prevent the trial court from evaluating for itself the merits of the jurisdictional

Case No. 10-61296-CIV-ALTONAGA/Brown

claim.  *See id.*  Moreover, "[i]n the face of a factual challenge to subject matter jurisdiction, the burden is on the plaintiff to prove that jurisdiction exists."  *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002) (citations omitted).

## III.  ANALYSIS

Defendants raise several arguments in their Consolidated Motion to Dismiss.  (*See* Mot.). Because the Court agrees that it lacks subject matter jurisdiction under the *Rooker-Feldman* doctrine, it does not  address the remaining arguments.

### A.  The Court Lacks Subject Matter Jurisdiction Under the *Rooker-Feldman* Doctrine.

Under 28 U.S.C. § 1257(a),[14] federal review of state-court judgments may only occur in the United States Supreme Court.  Thus, district courts lack jurisdiction to review final state-court judgments.  *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 486–87 (1983). Defendants maintain Figueroa is seeking "what amounts to appellate review of the final state court foreclosure judgment."  (Mot. 15).  Specifically, Defendants assert the Court lacks subject-matter jurisdiction to hear Figueroa's claims because they are barred by the *Rooker-Feldman* doctrine.  (*See*

---

[14]  Section 1257(a) reads:

> (a) Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court by writ of certiorari where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute of any State is drawn in question on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution or the treaties or statutes of, or any commission held or authority exercised under, the United States.

28 U.S.C. § 1257.

Case No. 10-61296-CIV-ALTONAGA/Brown

*id.* 15).

### 1. The *Rooker-Feldman* Doctrine, Generally

The *Rooker-Feldman* doctrine "makes clear that federal district courts cannot review state-court final judgments because that task is reserved for state appellate courts or, as a last resort, the United States Supreme Court." *Casale v. Tillman*, 558 F.3d 1258, 1260 (11th Cir. 2009). The doctrine applies to claims that were actually raised in the state court and those "inextricably intertwined" with that state judgment. *Id.* Where a party did not have a "reasonable opportunity to raise his [or her] federal claim in state proceedings[,]" however, the doctrine does not apply.[15] *Id.* (quoting *Powell v. Powell*, 80 F.3d 464, 467 (11th Cir. 1996)). In that situation, the federal claim is not considered to be inextricably intertwined with the state-court judgment. *See Powell*, 80 F.3d at 467 (citing *Wood v. Orange Cnty*, 715 F.2d 1543, 1547 (11th Cir. 1983)).

The Eleventh Circuit has identified two "scenarios" where a federal claim is inextricably intertwined with a state-court judgment: "(1) where the success of the federal claim would 'effectively nullify' the state-court judgment; and (2) where the federal claim 'succeeds only to the extent that the state wrongly decided the issues.'" *Springer v. Perryman*, No. 10-12059, 2010 WL 4230633, at *1 (11th Cir. Oct. 27, 2010) (per curiam) (quoting *Casale*, 558 F.3d at 1260).

### a. *Rooker* and *Feldman*

The *Rooker-Feldman* doctrine arose out of two Supreme Court cases: *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S.

---

[15] For full faith and credit purposes, a doctrine similar to *Rooker-Feldman* in many ways, the Supreme Court has held that a party has had a full and fair opportunity to litigate where the prior proceedings "satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause." *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 482 (1982).

Case No. 10-61296-CIV-ALTONAGA/Brown

462 (1983).

In *Rooker*, the plaintiffs sought to have a U.S. district court declare a state-court judgment "null and void." *Rooker*, 263 U.S. at 414. After losing in the Indiana state courts, the federal plaintiffs asked the federal court to proclaim the judgment violated the Constitution. *See id.* at 414–15. After the district court determined it lacked jurisdiction to hear the case, the federal plaintiffs appealed directly to the Supreme Court. *See id.* at 415. The Court affirmed, holding that district courts possess only original jurisdiction and not appellate jurisdiction. *See id.* at 416. It then stated even if the state court erred, that "did not make the judgment void, but merely left it open to reversal or modification in an appropriate and timely appellate proceeding." *Id.* at 415. The Court has made it clear that "Congress had empowered only [the Supreme] Court to exercise appellate authority 'to reverse or modify' a state-court judgment." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (quoting *Rooker*, 263 U.S. at 416).

Sixty years later the Supreme Court decided *Feldman*. There, the federal plaintiffs — Feldman and Hickey — petitioned the District of Columbia high court for waivers of the rule requiring graduation from an ABA-accredited law school for admission to the District of Columbia Bar. *See Feldman*, 460 U.S. at 463–73. Neither plaintiff graduated from an ABA-accredited law school, and the D.C. Court of Appeals denied both plaintiffs waivers and admission to the Bar. *See id.* Separately, the plaintiffs then filed suit in the district court challenging the state-court decisions. *See id.* at 468–69, 472–73. The district court dismissed Feldman's case for lack of subject matter jurisdiction because Feldman was seeking review of "an order of a jurisdiction's highest court." *Id.* at 470 (citation to the record omitted). Similarly, the district court dismissed Hickey's suit for a lack

17

Case No. 10-61296-CIV-ALTONAGA/Brown

of subject matter jurisdiction, finding the matter was "entrusted by the Congress to the D.C. Court of Appeals." *Id.* at 473 (citation to the record omitted). Feldman and Hickey appealed their federal cases to the D.C. Circuit Court of Appeals, and that court reversed on the ground that the waiver proceedings were not "judicial," and "thus did not foreclose litigation of the constitutional contentions in the District Court." *Id.* at 474 (quoting *Feldman v. Gardner*, 661 F.2d 1295, 1298 (D.C. Cir. 1981)).

The Supreme Court vacated and remanded the cases. The Court began its analysis by acknowledging district courts lack authority to review state-court judicial proceedings.[16] *See id.* at 476. On the other hand, district courts may review non-judicial state decisions. *See id.* at 476-77. The crucial question, then, was whether the D.C. court proceedings were "judicial in nature." *Id.* at 476. Finding the plaintiffs' waiver petitions were judicial in nature and not legislative, ministerial, or administrative, the Court concluded the federal district court could not review the D.C. court's decision because it lacked jurisdiction. *See id.* at 479, 482.[17]

In addressing the plaintiffs' claims that the D.C. court had acted arbitrarily and capriciously in denying Feldman's and Hickey's waiver petitions, the Court held that the district court could not hear these claims because they were "inextricably intertwined" with the D.C. court's decisions to deny plaintiffs waivers. *See id.* at 486–87.

_____

[16] The Court recognizes that the District of Columbia is not a state, but concludes, as the Supreme Court did, that its status is not relevant in this context.

[17] The Court came to a different conclusion on jurisdiction, however, with the plaintiffs' constitutional challenge to the Bar rule itself. In adjudicating challenges to the Bar rules, district courts do not necessarily have to review final state-court judgments. *See Feldman*, 460 U.S. at 486. If a court is "simply" reviewing the validity of a rule, one that was announced in a non-judicial proceeding, then section 1257 does not bar the district court's review. *Id.*

Case No. 10-61296-CIV-ALTONAGA/Brown

**b.  *Exxon Mobil***

Recently, the Supreme Court revisited the *Rooker-Feldman* doctrine in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005).  Reeling in lower courts, which had extended the doctrine "far beyond the contours of the *Rooker* and *Feldman* cases," the Court "confined" the doctrine to "cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 284.  The Court went on to hold that "*Rooker-Feldman* does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions." *Id.*

In *Exxon Mobil*, Saudi Basic Industries Corp. ("SABIC") sued two subsidiaries of Exxon and Mobil[18] ("ExxonMobil") in Delaware Superior Court in 2000, two decades after participating in joint ventures together.  *See id.* at 289.  ExxonMobil and its subsidiaries, two weeks later, countersued SABIC in the U.S. District Court for the District of New Jersey.  *See id.*  When the ExxonMobil subsidiaries answered SABIC's state-court complaint, they asserted counterclaims identical to the claims ExxonMobil advanced in federal court.  *See id.*  Following a trial by jury, ExxonMobil's subsidiaries received a state-court verdict of over $400 million.  *See id.*

Prior to the state-court trial, SABIC moved to dismiss in federal court.  *See id.* at 289–90.  The district court denied the motion, and SABIC took an interlocutory appeal to the Third Circuit.  *See id.*  Of its own accord, the circuit court considered whether *Rooker-Feldman* stripped the federal

---

[18]  At the time the ventures began, Exxon and Mobil were separate companies.  *Exxon Mobil*, 544 U.S. at 289.

Case No. 10-61296-CIV-ALTONAGA/Brown

courts of jurisdiction.  *See id.*  It held that jurisdiction existed at the beginning of the suit, but "terminated" when the state court entered its judgment.  *Id.* at 290 (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 364 F.3d 102, 104-5 (3d Cir. 2004)).

The Supreme Court disagreed with the Third Circuit, reversing and remanding the case.  *See id.* at 294.  The Court stated *Rooker-Feldman* only applies to federal cases *filed after* the state-court proceedings have ended.  *See id.* at 291.  When there are parallel state and federal cases, "*Rooker-Feldman* is not triggered simply by the entry of judgment in state court."  *Id.* at 292.  "'[T]he pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.'"  *Id.* (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910)).  In that situation, comity or abstention doctrines may lead a "federal court to stay or dismiss the federal action in favor of the state-court litigation."  *Id.* (citations omitted).  But importantly, the federal court does not lack jurisdiction.  *Id.*  Rather, in the case of parallel state and federal actions, "[d]isposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law," which is not jurisdictional.  *Id.* at 293.

### c.  Application of *Rooker-Feldman* in Similar Factual Situations

A recent case from the Eastern District of New York, *Swiatkowski v. Citibank*, No. 10-CV-114 (JFB)(WDW), 2010 WL 3951212 (E.D.N.Y. Oct. 7, 2010), is particularly instructive to the facts and claims presented here.  In *Swiatkowski*, plaintiff, her husband, and a relative (collectively the "Swiatkowskis") defaulted under their note and mortgage.  *See id.* at *1.  The mortgage, originally financed by Citibank, N.A. ("Citi"), was then the subject of a foreclosure action filed by Citibank's successor-in-interest.  *See id.*  A judgment of foreclosure was obtained on April 20, 1999.  *See id.*

20

Case No. 10-61296-CIV-ALTONAGA/Brown

After several bankruptcy filings and delays in the sale of the property, CitiMortgage accepted payment from the Swiatkowskis without a written settlement agreement. *See id.* at *1–2.

On January 23, 2003, Citi brought another action for foreclosure. *See id.* at *2. This time, Citi was granted summary judgment. *See id.* The Swiatkowskis then sought an order to show cause, filed a notice of appeal, and filed a petition to remove the foreclosure action to federal court. *See id.* They also filed a separate federal suit against Citi and other defendants alleging various claims. *See id.* The district court remanded the foreclosure action and dismissed the other federal suit for lack of federal jurisdiction. *See id.* The Second Circuit affirmed. *See id.* at *3. A final foreclosure judgment was eventually served on plaintiff on December 22, 2006. The Swiatkowskis then filed successive bankruptcy petitions, all of which were dismissed. *See id.*

In January 2010, the plaintiff filed her federal suit against certain banking institutions alleging several claims, including RICO. *See id.* at *5. Her claims were based on allegations that Citi had filed fraudulent documents in the bankruptcy proceedings, she was not notified of the foreclosure sale, there were improprieties in the notice of the sale, and any declaration of default or order of foreclosure was in error. *See id.* In her RICO claims, she alleged predicate acts of forgery, the submission of falsified documents, deprivation of due process, and perjury. *See id.*

The defendants moved to dismiss, arguing, *inter alia*, that the *Rooker-Feldman* doctrine precluded plaintiff's suit, as plaintiff was actually seeking relief from the earlier foreclosure action. *See id.* at *7. The court understood plaintiff's complaint as alleging defendants had "engaged in a pattern of submitting fraudulent and perjurious documents related to the . . . Judgment of Foreclosure and Sale in other courts . . . ." *Id.* at *9. The court framed plaintiff's suit as "seeking to undo the

Case No. 10-61296-CIV-ALTONAGA/Brown

2005 state court judgment based upon what plaintiff argues was a pattern of allegedly fraudulent activity, and . . . injuries that occurred as a result of the judgment . . . ." *Id.* Although the plaintiff also complained about actions occurring in the various bankruptcy petitions, "many of plaintiff's allegations of fraud involve[d] allegedly fraudulent documents or acts that were associated with the state court foreclosure proceeding." *Id.* Plaintiff further argued the fraud cast doubt on the proceedings that culminated in the foreclosure judgment. *See id.* at *9.

The court, in reviewing plaintiff's complaint, found her complained-of injuries stemmed from the foreclosure judgment. *See id.* It determined that to grant plaintiff her requested relief, the court "would necessarily have to review that [foreclosure] judgment . . . ." *Id.* The court went on to find that plaintiff's factual allegations were "inextricably intertwined with the state court judgment and would require overturning the state court judgment . . . ." *Id.* The allegations were inextricably intertwined because plaintiff claimed the state-court judgment was the result of fraud, and if the court accepted plaintiff's arguments, it "'would effectively declare the state court judgment fraudulently procured and thus void.'" *Id.* at *10 (quoting *Kropelnicki v. Siegel*, 290 F.3d 118, 129 (2d Cir. 2002)). Moreover, "[a]lthough plaintiff [] labeled the relief in the complaint as seeking monetary damages, it [wa]s abundantly clear that the whole purpose of th[at] action [wa]s to stop and undo the foreclosure judgment." *Id.* at *9. As a result, the court found "*Rooker-Feldman* clearly applie[d]." *Id.* The plaintiff had "'ample opportunity to raise th[e fraud] claim before the state court' in her answer or her motions for reconsideration[,] . . . [and] the proper venue to challenge that decision was by appeal in state court — not in federal court." *Id.* at *11 (internal quotation marks and citations omitted).

22

Case No. 10-61296-CIV-ALTONAGA/Brown

In addition to *Swiatkowski*, Defendants identify a recent Tenth Circuit case as "an almost identical attempt to challenge a state court final judgment through a subsequent RICO claim in federal court." (Mot. 16).[19]  In *Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006), Tal, Inc.'s ("Tal['s]") property was condemned by an Oklahoma state court.  *See id.* at 1250.  Almost two years later, Tal filed two motions for reconsideration based on newly discovered evidence of fraud, both of which were denied.  *See id.* at 1251.  The state appeals court affirmed the denial of both motions.  *See id.*

The *Tal* plaintiffs then filed a federal lawsuit alleging RICO and other claims.  *See id.*  The district court dismissed the complaint, and the Tenth Circuit affirmed.  *See id.* at 1252, 1271.

Tal's RICO claim alleged that defendants violated the statute "by engaging in a conspiracy to condemn its property through fraud."  *Id.* at 1255.  The district court found this claim was barred by *Rooker-Feldman*, and the Tenth Circuit agreed.  *See id.* at 1255–56.  The court gave three reasons. First, the state courts had considered and rejected Tal's claims that the condemnation was procured by fraud.  *See id.*  Second, the court said that if there were new allegations of fraud, they may create grounds for appeal.  *See id.*  But, the panel reasoned, that appeal should have been brought in state court.  *See id.*  Third, the court stated the "addition of new defendants in federal court also does not change the nature of the underlying state court ruling which upheld the validity of the condemnation."  *Id.* at 1257 (citing *Lavasek v. White*, 339 F.2d 861, 863 (10th Cir. 1965)).

The Tenth Circuit, in a footnote, discussed Tal's fraud allegations as a RICO predicate act. *See id.* at 1263 n.19.  In concluding that adjudicating these allegations was foreclosed by *Rooker-Feldman*, the court opined it could not

---

[19] Even though Defendants specifically highlight and discuss this case in their Motion, Plaintiff does not address it in his Opposition, failing to even attempt to distinguish it.

23

> consider the condemnation as a possible predicate act without calling into question the validity of the state court judgment. Thus, Tal, Inc.'s allegation that the condemnation was fraudulent and constituted a predicate act for RICO purposes is inextricably intertwined with the state court judgment and precluded by *Rooker-Feldman*.

*Id.* The court agreed the district court lacked jurisdiction.

Similarly, the Eleventh Circuit and many district courts in this circuit have applied *Rooker-Feldman* to dismiss actions where plaintiffs were, in reality, challenging state-foreclosure judgments. *See, e.g.*, *Parker v. Potter*, 368 F. App'x 945, 947–48 (11th Cir. 2010) (rejecting under *Rooker-Feldman* a federal claim under the Truth in Lending Act ("TILA") that sought rescission of a state foreclosure judgment); *Velardo v. Fremont Inv. & Loan*, 298 F. App'x 890, 892–93 (11th Cir. 2008) (holding that appellants' federal TILA claims were inextricably intertwined with a state-court foreclosure judgment and thus barred by *Rooker-Feldman*); *Harper v. Chase Manhattan Bank*, 138 F. App'x 130, 132–33 (11th Cir. 2005) (dismissing federal TILA, Fair Debt Collection Practices Act ("FDCPA"), and Equal Credit Opportunity Act ("ECOA") claims under *Rooker-Feldman* because they were inextricably intertwined with a state-court foreclosure proceeding); *Aboyade-Cole Bey v. BankAtl.*, No. 6:09-cv-1572-Orl-31GJK, 2010 WL 3069102, at *2 (M.D. Fla. Aug. 2, 2010) (finding the court had no jurisdiction to hear plaintiff's case under *Rooker-Feldman* because the case was, "at its core," an attempt to revisit a state-court foreclosure judgment); *Distant v. Bayview Loan Servicing, LLC*, No. 09-61460-CIV, 2010 WL 1249129, at * 3 (S.D. Fla. Mar. 25, 2010) ("Although plead as conspiracy claims . . ., Plaintiff is clearly asking this Court to invalidate the state court action by ruling that the state court foreclosure judgment is somehow void. Under the *Rooker-Feldman* doctrine, [defendant] is correct that this Court lacks subject matter jurisdiction, as

Case No. 10-61296-CIV-ALTONAGA/Brown

Plaintiff seeks a *de facto* appeal of a previously litigated state court matter. ").[20]

## 2. There is No Procedural Bar to the Application of *Rooker-Feldman*

Procedurally, *Rooker-Feldman* may apply here as this federal case was not filed until after the state-court proceedings concluded. The state-court foreclosure judgment was entered on February 1, 2010. (*See* 3d Am. Compl. 17). This case did not commence until July 26, 2010. Figueroa did not appeal the state-court foreclosure judgment and concedes "this action was not filed until after the conclusion of the state court litigation."[21] (Mot. Opp. 7 [ECF No. 176]). Because the

---

[20] Federal courts in other circuits have also consistently rejected cases seeking to attack state-court foreclosure judgments. *See, e.g.*, *Tropf v. Fidelity Nat'l Title Ins. Co.*, 289 F.3d 929, 937–38 (6th Cir. 2002) (affirming dismissal of a RICO action under *Rooker-Feldman* where plaintiffs were alleging various frauds in connection with a state-court foreclosure judgment that allegedly allowed banks to "wrongfully" take their home); *Rene v. Citibank NA*, 32 F. Supp. 2d 539, 543 (E.D.N.Y. 1999) (finding that subject-matter jurisdiction did not exist under *Rooker-Feldman* to adjudicate plaintiffs' RICO and § 1983 claims because plaintiffs asked the court "to review the state court's judgment of foreclosure and eviction, by seeking damages for the loss of their property . . . ."); *Simpson v. Putnam Cnty Nat'l Bank of Carmel*, 20 F. Supp. 2d 630, 633 (S.D.N.Y. 1998) ("[P]laintiff claims that defendants' actions caused him injury through the (1) loss of his real property; (2) loss of his residence; (3) loss of business relationships, esteem, and respect of some who dealt with him; and (4) damage to his creditworthiness . . . . [Plaintiff] seeks to require this Court to revisit the State Court's foreclosure judgment that resulted in the loss of his property, and to declare that judgment invalid on account of the defendants' allegedly fraudulent actions. Under *Rooker-Feldman*, however, this Court has no authority to review the . . . judgment. Nor does the fact that plaintiff alleges that the . . . foreclosure judgment was procured by fraud and conspiracy change that result."); *Smith v. Wayne Weinberger, P.C.*, 994 F. Supp. 418, 424 (E.D.N.Y. 1998) (rejecting a federal claim that, in reality, attacked a state-court foreclosure judgment: "The fact that the plaintiff alleges that the State Court judgment was procured by fraud does not remove his claims from the ambit of *Rooker-Feldman*. . . . Smith's claims for conversion are merely a thinly-veiled effort to invalidate the State Court's foreclosure judgment, in contravention of Rooker-Feldman."); *Zipper v. Todd*, No. 96 Civ. 5198(WK), 1997 WL 181044, at *3 (S.D.N.Y. Apr. 14, 1997) ("While it is true that plaintiffs never actually raised the federal claims of Section 1983, RICO and SLAPP violations before the state court, *Rooker-Feldman* precludes district court review of claims 'inextricably intertwined' with state court determinations. The fact that plaintiffs raise new claims under federal statutes does not preclude a finding that they are barred by the *Rooker-Feldman* doctrine.") (internal citation omitted); *In re Rusch*, No. 09-44799, 2010 WL 5394789, at *3 (Bankr. D.N.J. Dec. 28, 2010) ("[T]he Courts in this Circuit have consistently found Rooker-Feldman to be applicable and a bar to plaintiff's relief in a federal district court in the context of state foreclosure actions.").

[21] The Eleventh Circuit has recently clarified that if a state appeal is pending, state proceedings have not ended for *Rooker-Feldman* purposes. *See Nicholson v. Shafe*, 558 F.3d 1266, 1276 (11th Cir. 2009).

25

Case No. 10-61296-CIV-ALTONAGA/Brown

state-court judgment was rendered and no appeal was taken, the state court judgment became final

before the proceedings began here and *Rooker-Feldman* may apply.

### 3. Plaintiff's Federal Claims are Inextricably Intertwined with the State-Court Judgment.

Defendants contend Figueroa is seeking "what amounts to appellate review of the final state

court foreclosure judgment." (Mot. 15). They maintain that Figueroa's claims are inextricably

intertwined[22] with the state-court judgment because the only injury he complains of is "the

foreclosure of his property through the state court final judgment." (*Id.* at 16). According to

---

[22] Plaintiff contends that "inextricably intertwined" is no longer the test in determining *Rooker-Feldman*'s applicability. (Mot. Opp. 8). This is incorrect.

Prior to the Supreme Court's decision in *Exxon Mobil*, courts in the Eleventh Circuit used the *Amos* test when determining whether the *Rooker-Feldman* doctrine applied. *See Nicholson*, 558 F.3d at 1272. That four-part test considered whether:

> (1) the party in federal court is the same as the party in state court; (2) the prior state court ruling was a final or conclusive judgment on the merits; (3) the party seeking relief in federal court had a reasonable opportunity to raise its federal claims in the state court proceeding; and (4) the issue before the federal court was either adjudicated by the state court or was inextricably intertwined with the state court's judgment.

*Id.* (quoting *Amos v. Glynn Cnty. Bd. of Tax Assessors*, 347 F.3d 1249, 1266 n.11 (11th Cir. 2003) (internal citations omitted)). In *Nicholson* the Eleventh Circui eschewed that test in favor of the strict language of *Exxon Mobil*. *See Nicholson*, 558 F.3d at 1274 (citing *Exxon Mobil*, 544 U.S. at 284).

While the Eleventh Circuit has abandoned the *Amos* test, it continues to acknowledge that "*Rooker-Feldman*'s reach extends to federal claims raised by the state-court loser that are deemed to be 'inextricably intertwined' with the state court judgment." *Springer*, 2010 WL 4230633, at *1 (citing *Casale*, 558 F.3d at 1260); *Casale*, 558 F.3d at 1260 (*Rooker-Feldman* "applies both to federal claims raised in the state court and to those 'inextricably intertwined' with the state court's judgment." (citing *Feldman*, 460 U.S. at 482 n.16)). In fact, the Eleventh Circuit has stated post-*Exxon Mobil* and *Nicholson*: "[W]e must determine whether a plaintiff is a state-court loser who is complaining of injuries caused by state-court judgments. In doing so, our circuit has continued to apply the fourth factor of the *Amos* test, evaluating whether the plaintiff's claims are 'inextricably intertwined' with the state court judgment." *Cormier v. Horkan*, No. 10-11089, 2010 WL 3705973, at *2 (11th Cir. Sept. 23, 2010) (per curiam) (internal citations omitted).

26

Case No. 10-61296-CIV-ALTONAGA/Brown

Defendants, because the foreclosure "was adjudged to be proper in the final state court judgment[, it] cannot now be challenged in federal court as being a criminal act in RICO claims." (*Id.*).

Plaintiff responds that *Rooker-Feldman* should not apply in this case.[23]  (*See* Mot. Opp. 7). He advances four main arguments: (1) *Rooker-Feldman* does not apply because the state-court case was concluded prior to the filing of the federal action; (2) he is not appealing from the state-court judgment;[24] (3) the Court should follow a recent Southern District of New York case, *Sykes v. Mel Harris and Associates*; and (4) he did not have a full and fair opportunity to litigate in state court.[25] The Court addresses each argument in turn.

### a. *Rooker-Feldman* Applies Because This Case Was Not Filed Until *After* the State-Court Case Concluded.

Plaintiff begins his arguments with a faulty premise.  He asserts first and foremost that *Rooker-Feldman* does not apply here "because this action was not filed until after the conclusion of the state court litigation . . . ." (Mot. Opp. 7).  Plaintiff sets the law wrong.  As discussed, the Supreme Court in *Exxon Mobil* emphasized that *Rooker-Feldman* may *only* apply where the federal action is filed *after* there is a final state-court judgment.  *Exxon Mobil*, 544 U.S. at 283; *see also Nicholson*, 558 F.3d at 1273–74 (quoting *Exxon Mobil*, 544 U.S. at 283–94).  Plaintiff cites

---

[23]  Throughout Plaintiff's memorandum, references to cases, congressional statements, and other outside evidence lack pinpoint citations.  It is not the duty of the Court to scour the record to find those specific references and places the parties deem relevant.  "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

[24]  This argument is related to Figueroa's incorrect assertion, discussed *supra* in note 22, that inextricably intertwined is no longer the relevant test.

[25]  Plaintiff did not actually raise this argument, but based on an allegation in the Complaint, this is a point the Court considers necessary to address.

Case No. 10-61296-CIV-ALTONAGA/Brown

*Nicholson* for the "principle of law" that "in cases where the state court action is already complete, preclusion law, rather than [*Rooker-Feldman*] applies . . . ." (Mot. Opp 22). But that *Nicholson* "principle of law" applies to "parallel state and federal litigation," where state and federal suits are pending (at least for a while) at the same time. *Nicholson*, 558 F.3d at 1273–74 (citing *Exxon Mobil*, 544 U.S. at 292–93). When there is parallel litigation, "*Rooker-Feldman* is not triggered simply by the entry of judgment in state court[;]" in those cases, preclusion principles may apply. *Exxon Mobil*, 544 U.S. at 292.

In short, the applicability of *Rooker-Feldman* and preclusion law breaks down like this:

(1)     when the state and federal cases are parallel, that is, ongoing at the same time, even if only for a moment, preclusion law may apply, but *Rooker-Feldman* may not;

(2)     when the federal case is not filed until after the conclusion of the state-court litigation, including the resolution of any appeals, both preclusion law and *Rooker-Feldman* may apply. *See Exxon Mobil*, 544 U.S. at 292–93; *Nicholson*, 558 F.3d at 1273–74 (citing *Exxon Mobil*, 544 U.S. at 292–93).

Here, even Plaintiff has conceded that the state-court proceedings had terminated prior to the filing of this federal action. (*See* Mot. Opp. 7). Thus *Rooker-Feldman*, as well as preclusion principles, may apply.

> **b. Plaintiff is "Appealing" from the State-Court Foreclosure Judgment Because His Federal Claims are "Inextricably Intertwined" with the Foreclosure Judgment.**

Beyond Plaintiff's erroneous formulation of *Rooker-Feldman*, he also contends that the doctrine does not apply because he is not "appealing" from the state-court judgment. (Mot. Opp. 8). As discussed, Plaintiff inaccurately maintains that "inextricably intertwined" is no longer the test to

28

Case No. 10-61296-CIV-ALTONAGA/Brown

determine whether an issue is barred by *Rooker-Feldman*.[26]  (*Id.*).  But that is indeed the test, and Figueroa's claims are inextricably intertwined with the state foreclosure judgment.

This suit is barred by *Rooker-Feldman* because Plaintiff's claims can only succeed if the Court implicitly or explicitly determines the Florida state court wrongly decided the foreclosure issue.  Plaintiff's Complaint seeks damages arising out of the loss of his home.  (*See* 3d Am. Compl. 29 ("As a result of the RICO enterprise of which these actions were part, the Class Members have suffered damages, in that they have lost their homes."); 35 (same); 44 ("The overt acts committed in furtherance of the conspiracy damaged the Class Members in Florida  . . . [in that they] were illegally divested of their Florida real properties.")).  The only way Plaintiff (and putative class members) could have been "damaged" by the loss or "illegal divestment" of their homes is if those foreclosures were wrongful.[27]  In fact, Figueroa concedes as much in his Opposition, acknowledging he suffered no damages until the Florida state court entered the foreclosure judgment.  (*See* Mot. Opp. 22 (stating that Figueroa "suffered no damages prior to the entry of final judgment . . . .")).  But by entering judgments of foreclosure, the Florida state courts determined the foreclosures were proper.  These state courts exercised their authority over state law and found the foreclosing parties satisfied Florida's procedural safeguards.

For Figueroa's federal RICO claims to succeed, the Court must find that wire and mail fraud occurred in Defendants' prosecution of foreclosures.  If the Court concludes that mail and wire fraud

---

[26]  Plaintiff failed to substantively argue that his federal claims are not inextricably intertwined with the state-court judgment.  He simply — and erroneously — asserts this is no longer the test and moves on.

[27]  Of course, if the foreclosures were proper, class Plaintiffs would not be "damaged" by the foreclosures even though they lost their homes because those losses would be a *proper* legal result.

occurred in obtaining the foreclosures, and that the fraud damaged Plaintiff and class members, the Court would be saying the foreclosures were wrongfully granted and the resulting judgments are void. *See, e.g.*, *Swiatkowski*, 2010 WL 3951212, at *10 (plaintiff claimed that the state court judgment was the result of fraud, and if the court accepted plaintiff's arguments, it "'would effectively declare the state court judgment fraudulently procured and thus void.'" (quoting *Kropelnicki*, 290 F.3d at 129)). Figueroa's federal claims can only succeed to the extent the Florida court erred, and the Court cannot grant Figueroa his requested relief without disturbing the Florida foreclosure judgment. *Cf. Sophocleus v. Ala. Dep't of Transp.*, 605 F. Supp. 2d 1209, 1218 (M.D. Ala. 2009). It is for the state appeals courts and the U.S. Supreme Court to tell the state court it was wrong. This Court has no such role. Finally, to the extent Plaintiff seeks money damages and not an explicit overturning of the state-court judgment, this does not change the Court's conclusion, as damages would only be available where there was a wrongful foreclosure. *See, e.g.*, *Rene*, 32 F. Supp. 2d at 543. Because the federal claims can only succeed if the state court wrongly granted the foreclosure, the federal and state claims are inextricably intertwined.

This conclusion is further buttressed by Plaintiff's state-court filings, including the two motions he and Brown filed seeking to vacate the foreclosure judgment and the motion to dismiss for lack of subject matter jurisdiction. (*See* Mot. Ex. A, at 2–12). In the emergency motion to vacate the state-court judgment, Figueroa asserted IndyMac and other banks committed fraud and engaged in a pattern of fraud and deception while attempting to foreclose residential properties. (*See id.* at 7). Figueroa further argued in the emergency motion that IndyMac did not have standing to foreclose on his property. (*See id.* at 9). Likewise, in the motion to dismiss, Brown asserted that IndyMac did

Case No. 10-61296-CIV-ALTONAGA/Brown

not have standing to foreclose because it was not the owner of the note and mortgage. (*See id.* at 18).

Moreover, although not actually raised, Figueroa explained in the emergency motion that he "intended" to raise affirmative defenses to the foreclosure and intended to file several counterclaims, including RICO claims. (*See id.* at 10). Figueroa's emergency motion was filed to overturn the state-court foreclosure judgment, and he resurrects the same arguments in this RICO action. This repetition and repackaging of earlier arguments demonstrates Figueroa's true purpose here is to attack the state-court judgment.[28] *Rooker-Feldman* does not permit him to do so. *Cf. Ware v. Polk Cnty. Bd. of Cnty. Comm'rs,* No. 09-16140, 2010 WL 3329959, at *1 (11th Cir. Aug. 25, 2010) (per curiam) (rejecting a section 1983 claim under *Rooker-Feldman* because plaintiff's "federal claims [we]re either the same as those raised in his counterclaims in state court or otherwise inextricably intertwined with the state court judgment because they focus[ed] on the legality of the lien that was litigated in state court.").

### c. *Sykes v. Mel Harris and Associates* is Distinguishable.

Plaintiff asks the Court to follow *Sykes v. Mel Harris & Assocs., LLC,* No. 09 Civ. 8486(DC), 2010 WL 5395712 (S.D.N.Y. Dec. 29, 2010), where the court declined to dismiss the case under the *Rooker-Feldman* doctrine. *See id.* at *10. Plaintiffs there were served via "sewer service" — where process servers would not actually serve defendants but would still report service as completed. *Id.*

---

[28] Plaintiff's "supplemental authority" (*see* Notice of Supplemental Authority [ECF No. 181]) indicates that his true intent is to overturn the foreclosure. He cites cases where the state courts rejected foreclosures based on similar underlying facts — where it was questionable whether properties were properly assigned. *See Onewest Bank, F.S.B. v. Drayton*, 29 Misc. 3d 1021 (N.Y. Sup. Ct. 2010) (rejecting a foreclosure filing and questioning the right of the plaintiff-bank to foreclose); *see also U.S. Bank Nat'l Ass'n v. Ibanez*, No. SJC-10694, 2011 WL 38071 (Mass. Jan. 7, 2011) (affirming the invalidation of mortgage foreclosures where, a result of sloppy mortgage transfers and possible fraud, there was insufficient evidence to demonstrate the plaintiff banks held the mortgages and had the right to foreclose).

Case No. 10-61296-CIV-ALTONAGA/Brown

at *2.  After the faulty service, creditors would then obtain default judgments and attack defendants'

assets.  *Id.* at *2–3.

      The court in *Sykes* found that *Rooker-Feldman* did not apply because the plaintiffs' claims

were independent of state-court judgments and did not seek to overturn them.  *See id.* at 10.  Notably,

however, the state-court judgments there had already been "vacated or discontinued" in the state

court, and plaintiffs' declaratory and injunctive relief claims were distinct from the vacated

judgments.  *Id.*  Since the state-court judgments had previously been overturned, the district court

could issue orders that would not nullify the state-court judgments; there were no state judgments

at all.  With no valid state-court decisions, the plaintiff could succeed without the state court having

wrongly *decided* the issues.  *See id.*  Further, without adverse judgments against them, the plaintiffs

in *Sykes* could not properly be called "state-court losers," a status that is required for *Rooker-*

*Feldman* to apply.  Here, on the other hand, the Court cannot grant Plaintiff, a state-court loser, his

sought-after relief without fundamentally undermining the state-court judgment.  To the extent the

Court could grant Plaintiff damages, it would have to find the foreclosure was improper, a finding

at odds with that of the Florida court.  This case is clearly distinguishable from *Sykes*.[29]

### d.  Figueroa had a Full and Fair Opportunity to Litigate in State Court.

      Finally, Plaintiff had a full and fair opportunity to litigate in state court.  The foreclosure

action was filed in Florida circuit court, a court of general jurisdiction.  (*See* Mot. Ex. A); FLA.

CONST. art. V, § 5; FLA. STAT. § 26.012.  Federal RICO claims may be raised in Florida circuit

---

[29] Furthermore, Plaintiff here actually presented the fraud issue to the trial court.  (*See* Mot. Ex. A (twice asserting fraud in the Florida state court during the foreclosure proceedings, in a motion to vacate summary judgment and in an emergency motion to vacate judgment)).

Case No. 10-61296-CIV-ALTONAGA/Brown

courts. *See, e.g.*, *Winters v. Mulholland*, 33 So. 3d 54, 56 (Fla. 2d DCA 2010) (discussing a Florida state-court case containing a federal RICO claim that went to trial in a Florida circuit court).

Plaintiff's Complaint, in passing and without discussion, states that "a default was entered against Mr. Figueroa." (3d Am. Compl. 17). This is alleged to have occurred because although he and Brown were served with and were aware of the foreclosure complaint, they chose not to respond because of an erroneous belief that service was improper. (*See id.*).

Defendants included as exhibits the state-court filings from Plaintiff's foreclosure action.[30] (*See* Mot. Ex. A). There are no references anywhere — in the IndyMac filings, court filings, or Figueroa and Brown filings — of Figueroa or Brown defaulting in the foreclosure case. (*See generally id.*). In fact, the papers indicate otherwise, showing IndyMac prevailed with a summary judgment. (Mot. Ex. A, at 13–17, 21–23 ).

Nevertheless, in the Complaint, Figueroa alleges that a default was entered against him on September 16, 2009. (*See* 3d Am. Compl. 17). IndyMac's summary judgment motion was filed two-days earlier, on September 14, 2009. (*See* Mot. Ex. A, at 21–23). In response to the summary judgment motion, Brown filed a motion to dismiss based on a lack of subject matter jurisdiction on January 13, 2010. (*See id.* at 18–20). Nowhere in that motion to dismiss is there any mention of improper service or a default. (*See id.*). And when summary judgment was granted on February 1, 2010, the Florida court made no mention of a previous default judgment. (*See id.* at 13–17).

Three days after summary judgment was granted, Figueroa and Brown filed their emergency

---

[30] As discussed, Defendants' *Rooker-Feldman* challenge is a factual attack on the existence of subject matter jurisdiction. The Court is not required to presume the truthfulness of plaintiff's allegations and may weigh the evidence. *See Lawrence*, 919 F.2d at 1529.

motion to vacate the judgment and foreclosure sale. (*See id.* at 7–12). In that motion, they made

numerous arguments — including RICO and fraud allegations. (*See id.*). Again, no references to

improper service or a default judgment appear.[31] (*See id.*).

Figueroa and Brown, through retained counsel, filed a second motion to vacate the summary

judgment on February 22, 2010. (*See id.* at 2–6). Their counsel also made no mention of improper

service or a default judgment. (*See id.*). In fact, the only "default" mentioned in any of the state-

court filings is Figueroa's and Brown's default on their mortgage. (*See* Mot. Ex. A, at 21).

The Court does not credit Plaintiff's allegation of a default. Beyond the sole sentence in the

Complaint, there simply is no evidence that a default was ever entered against Figueroa. No state-

court filing demonstrates one was entered. And if one was entered, Figueroa and Brown would have

undoubtedly sought to vacate it, as they attempted to vacate the entry of summary judgment. Even

if a default was entered in that case, it would not preclude a finding that Figueroa and Brown had a

full and fair opportunity to litigate given that they were aware of the litigation and made a conscious

decision to not respond. *See, e.g.*, *In re Harmon*, 250 F.3d 1240, 1247 (9th Cir. 2001) (finding that

a default judgment is an estoppel as to all litigated issues if the defendant is served but fails to

respond because he or she is presumed to admit all facts that were pleaded, but a default is not an

estoppel to defendants who were unaware of the litigation). Figueroa and Brown were aware of the

state action and had a full and fair opportunity to litigate, but chose not to do so until the summary

---

[31] There is mention of an intent to raise a malicious abuse of process defense. (*See* Mot. Ex. A, at
10).

Case No. 10-61296-CIV-ALTONAGA/Brown

judgment motion was filed.[32]

## IV.  CONCLUSION

In this action Plaintiff is seeking to attack a state foreclosure judgment, and the RICO claims are inextricably intertwined with that foreclosure judgment.  The Court thus lacks jurisdiction to hear the claims under the *Rooker-Feldman* doctrine.  Having chosen not to appeal in state court, Plaintiff may not, effectively, appeal his adverse judgment here.

It is therefore **ORDERED AND ADJUDGED** that the Motion to Dismiss **[ECF No. 162]** is **GRANTED with prejudice**.  The Clerk of the Court is directed to mark this case **CLOSED**.  All pending motions are denied as moot

**DONE AND ORDERED** in Chambers at Miami, Florida, this 31st day of January, 2011.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

_____

[32] Additionally, any contention that Figueroa did not have an opportunity to raise his claims because he lacked knowledge of the conspiracy must fail as well.  "'[A] litigant may not rely on the deception of her opponents to demonstrate that she was not afforded a reasonable opportunity to raise her claims.'" *Swiatkowski*, 2010 WL 3951212, at *10 (quoting *Kropelnicki*, 290 F.3d at 128).